Pamela A. GRUBB, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security, Defendant.

Civil Action No. 96–1091–FGT.

United States District Court, D. Kansas.

July 1, 1998.

David H. M. Gray, Gragert, Hiebert & Gray, Wichita, KS, for Plaintiff.

Robin Barkett Moore, Office of U.S. Atty., Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

WESLEY E. BROWN, District Judge.

This is an action for judicial review of a final agency determination by the Social Security Administration denying plaintiff's application for disability benefits. The court has considered the briefs filed by the plaintiff and the Commissioner, as well as the administrative record and the applicable law, and is prepared to rule.

### I. Facts

On November 24, 1992, plaintiff filed applications for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. and for SSI benefits under Title XVI, 42 U.S.C. §§ 1381 et seq. (Tr. 104–06; 133–36).[1] Plaintiff alleged disability beginning on August 23, 1991, The Commissioner denied plaintiff's claim initially and on reconsideration. (Tr. 107–08; 112–13; 138; 143). Plaintiff received an administrative hearing on June 21, 1994. She was represented by counsel at the hearing. (Tr. 25). On October 8, 1994, the Administrative Law Judge ("ALJ") issued a ruling finding that plaintiff was not disabled with in the meaning of the Social Security Act. (Tr. 22–40). The Appeals Council denied plaintiff's request for review. (Tr. 11–12). Thus, the decision of the ALJ rests as the Secretary's final determination.

The plaintiff was born on May 2, 1967. (Tr. 104). She was twenty-seven years old at the time of her administrative hearing. Plaintiff has an eleventh or twelfth grade education and left school at age nineteen.[2] (Tr. 162, 265). She can read and write, but claims to have trouble reading because of dyslexia. (Tr. 275).

Plaintiff's past work history is as a nurse's aide, fast food worker, clothing store assistant manager and cashier. (Tr. 162). Her most recent work was as a nurse's aide in New Jersey. (Tr. 162). Plaintiff had two unsuccessful attempts to work as a nurse's aide in 1992.

Plaintiff had an accident with a table saw in 1986. Her index and middle left fingers were cut off. (Tr. 267). However, they were reattached, and she has some use of those fingers. Plaintiff underwent multiple surgeries on her left hand. Plaintiff does not have full range of motion and claims she has no feeling in the affected fingers. Plaintiff was left-handed before the accident, but has become right-handed since.

Plaintiff injured her right ankle in August 1991. She filed a workers' compensation claim based on this injury. (Tr. 160). Dr. Duane Murphy treated plaintiff with regard to her ankle injury. Dr. Murphy's notes state that she was hurt while jumping on a trampoline in 1992. (Tr. 183).

A bone scan in December 1992 revealed a small stress fracture. (Tr. 181). Dr. Murphy placed plaintiff on a no work restriction in October 1992 and repeated the restriction in January and March 1993. (Tr. 181). In March 1993, he noted that plaintiff's symptoms were markedly improved. (Tr. 181). A March bone scan was canceled because plaintiff reported she was pregnant. (Tr. 182). She called again on April 20 to report that she had miscarried. (Tr. 183). In November 1993, Dr. Murphy put plaintiff back in a removable cast. (Tr. 172). Surgery was discussed at various times, but plaintiff has never undergone surgery for her ankle. (Tr. 183). In February 1994, Dr. Murphy noted that plaintiff was getting along fairly well with the removable cast, although it did not provide as much support as a full cast. (Tr. 217). Plaintiff was pregnant at that time, and there was nothing more to be done for her until after she delivered. (Tr. 217).

Plaintiff was involved in an automobile accident on August 7, 1993. She saw the doc-

---

1. Plaintiff had previously filed for benefits on June 8, 1990. (Tr. 58–60; 75–86). That application was denied initially and was not pursued further. (Tr. 61–71; 88–90).

2. This is one of many facts on which there is conflicting evidence. There was no attempt to resolve the conflicts at the administrative level and, to the extent they do not bear directly on the outcome of this appeal, the court will not resolve them.

tor and complained of back and neck pain. (Tr. 228). She also stated her ankle hurt when she walked. (Tr. 228). By August 24, 1993, it was noted that physical therapy had relieved some of plaintiff's pain.

In April 1994 Dr. Murphy completed a medical assessment of plaintiff's functional capacity. (Tr. 197–200). Dr. Murphy stated that in an eight-hour day plaintiff could sit eight hours, stand three hours, and walk one hour. (Tr. 197). She could also sit eight hours, stand three hours, or walk one hour before having to change positions. (Tr. 197). Dr. Murphy stated that it was not medically required that plaintiff be in a reclined position or elevate her leg at any time during the day. (Tr. 198). She could lift as much as twenty-five pounds constantly. (Tr. 198). She could use her right or left arm for continuous pushing and pulling. (Tr. 198). Plaintiff was capable of climbing stairs or ladders, crawling, crouching occasionally, and twisting frequently. (Tr. 198–99). He found she could handle large items or finger small items continuously. (Tr. 199). No environmental limitations were noted. (Tr. 199).

Apparently, plaintiff admitted herself to Wesley hospital for treatment of depression at one time. It is unclear from the record on appeal whether this was in 1990 or 1993. Plaintiff now claims she was in the hospital in 1993. However, on a disability report filled out in 1992, plaintiff stated she was hospitalized "about two years ago." Moreover, there apparently was a record from Wesley hospital indicating that plaintiff was admitted in 1990, but that she was released because her claims could not be verified. The ALJ struck this exhibit from the record because plaintiff's attorney contended it did not pertain to the plaintiff. In fact, the plaintiff still contends it is not her hospital record although, according to the ALJ, it had her name and Social Security number. At any rate, the 1990 record was removed from the claim file and is not in the record on appeal. There is no record of a hospitalization in 1993.

In a disability report filed in 1992, plaintiff described her daily activities as watching television, fixing simple meals and crying a lot. (Tr. 161). Plaintiff told Dr. deWit in 1993 that she does housework and goes out with friends some evenings. (Tr. 192). She also writes poetry and "unsent" letters. (Tr. 192)

Plaintiff was examined by a consulting psychologist, Dr. Fred deWit on May 28, 1993. (Tr. 190). Plaintiff told Dr. deWit that her only problem was her husband, who had committed suicide on December 27, 1992. (Tr. 190). She reported having a miscarriage on May 11, 1993. (Tr. 190). She told Dr. deWit that she did not enjoy life, she had insomnia and nightmares, her appetite was sharply decreased, and she had crying episodes and low energy. (Tr. 190). Plaintiff also reported memory loss, reduced concentration, verbal temper outbursts and anxiety attacks. (Tr. 190). Plaintiff had hallucinations of her dead husband and her stillborn brother. (Tr. 191). According to Dr. deWit's tests, plaintiff's memory was borderline. (Tr. 191). Her IQ was between eighty and ninety, low average. (Tr. 191).

Dr. deWit diagnosed single episode major depression with psychotic features, anxiety disorder, post-traumatic stress disorder and schizotypal personality disorder. (Tr. 192) Dr. deWit believed plaintiff could get along with coworkers and supervisors and could understand and perform simple tasks. (Tr. 192). However, he had "strong doubts about her ability to sustain concentration over an eight-hour day and keep a work schedule with average performance demands." (Tr. 192). He found plaintiff could manage her own funds. (Tr. 192).

In June 1994, plaintiff's attorney referred her to Dr. Kerin Schell for evaluation and/or treatment. (Tr. 239). According to the record, plaintiff saw Dr. Schell three times, twice before and once after the administrative hearing. Dr. Schell stated that plaintiff's most severe mental problems began in 1992 when her husband's girlfriend shot and killed him and plaintiff was, for a time, suspected of the murder.[3] (Tr. 239, 249). Dr. Schell stated that plaintiff had dysthymic

---

**3.** This is the only reference in the record to plaintiff's husband having been murdered or plaintiff having been a suspect.

disorder, or mild depression, constantly with one or two days per week of severe depression. (Tr. 240). He also found she had manic episodes once per month. (Tr. 240). Dr. Schell diagnosed bipolar disorder, dysthymia, insomnia, pain disorder, attention deficit/hyperactivity disorder. (Tr. 240). "She had mental disorders prior to 1992, but she decompensated severely in 1992 and never recovered." (Tr. 240). Dr. Schell expressed the opinion that plaintiff's mental condition would prevent her from holding a job and that any attempt to work would exacerbate her bipolar disorder. (Tr. 240). In a letter written after the administrative hearing, Dr. Schell added a diagnosis of post-traumatic stress disorder and stated that her full scale IQ was 71, indicating a low borderline intelligence. (Tr. 249). Dr. Schell stated that plaintiff cannot take care of her own finances because managing a checkbook is too difficult for her and she forgets to pay bills. (Tr. 250).

At the administrative hearing, Dr. Krishna Lingaih Rama Das testified as a medical expert in the field of psychiatry. (Tr. 287). Dr. Das had reviewed the plaintiff's medical records, but had not examined her. (Tr. 287). Dr. Das testified that the record did not support a diagnosis of bipolar disorder because a person with bipolar disorder is usually hospitalized or treated with medication. (Tr. 290). Dr. Das noted that there is a correlation between the reports of Dr. Schell and Dr. deWit in that both diagnose depression. (Tr. 290). Dr. Das testified that plaintiff "might have difficulty in working in a competitive work setting, particularly when she's very depressed . . . ." (Tr. 294).

James Molski testified as a vocational expert at the administrative hearing. He was asked to consider a person of plaintiff's age, education and work experience. (Tr. 302). The ALJ asked him to consider that the person has a traumatic injury to the right ankle, an injury to the left hand that affects two fingers and depression. (Tr. 302). The ALJ asked Molski to assume the person could lift up to twenty pounds occasionally and ten pounds frequently, that she could stand five or six hours and sit two hours in a day and could stand one hour at a time, and that there was a restriction against frequent ladder climbing, climbing of stairs or walking

on uneven surfaces. (Tr. 303). Molski testified that a diagnosis of depression does not necessarily mean the person is disabled. (Tr. 302). He testified further that plaintiff's past work as a nurse's aide would be eliminated, but she would be able to perform seventy-five percent of cashier jobs. (Tr. 304).

The ALJ then asked Molski to consider a standing limitation of no more than two hours in a day. (Tr. 305). This limitation would eliminate all of plaintiff's past work. (Tr. 305). However, the base of 200 unskilled sedentary positions would be available. (Tr. 305). A restriction against stressful occupations and a limitation to routine, repetitive work would not affect the positions available. (Tr. 307–08). One or two percent of the jobs would be eliminated if the person could not read or follow more than simple instructions. (Tr. 307). If a restriction against more than casual or infrequent contact with coworkers or the public were necessary, up to ten percent of the sedentary, unskilled job base would be eliminated. (Tr. 308). Molski testified that eighty percent of the sedentary, unskilled job base would be available to such a person, including optical goods assembler (330 positions in Wichita, Kansas, 110,000 nationally) and sedentary factory worker (650 positions in Wichita, 65,-000 nationally). (Tr 308–09).

On cross-examination, Molski was asked to consider that the person was essentially one-handed, having lost function of her former dominant hand. (Tr. 310) Molski testified that practically all the sedentary, unskilled job base would be eliminated, with the possible exception of such positions as security systems monitor. (Tr. 310).

The ALJ found plaintiff was not disabled. (Tr. 37). The ALJ found there were inconsistencies in the record, including the medical evidence. (Tr. 26, 31). He concluded plaintiff's credibility was suspect. (Tr. 31). The ALJ found plaintiff's claims of pain were not supported by the totality of the evidence. (Tr. 31). He concluded that a restriction to sedentary work would accommodate plaintiff's exertional limitations. (Tr. 35). The ALJ concluded that plaintiff suffers mild depression, which is not disabling. He rejected

Dr. Schell's opinions, finding that Dr. Schell was not a treating source, and his opinions were based on plaintiff's statements rather than objective evidence. (Tr. 33). Instead, the ALJ relied on Dr. Das's testimony, which according to the ALJ was that plaintiff had some dysthymia, restricting her to low-stress occupations. (Tr. 34). The ALJ concluded, citing Dr. Das's testimony, that plaintiff's "depression, if any, would be treatable." (Tr. 34).

## II. Standard of Review

The standard of review in this case is established by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ." Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Fowler v. Bowen,* 876 F.2d 1451, 1453 (10th Cir.1989). It is not the duty of the court to reweigh the evidence, or substitute its decision for that of the ALJ. *Talbot v. Heckler,* 814 F.2d 1456, 1461 (10th Cir.1987). Substantial evidence, however, must be more than a mere scintilla. *Perales,* 402 U.S. at 403, 91 S.Ct. 1420. This court's determination entails a review of "the record as a whole, and 'the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Talbot,* 814 F.2d at 1461. (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). In applying these standards, the court must keep in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir. 1965).

The Secretary uses a five-step process for deciding whether a Social Security claimant is disabled. The Tenth Circuit Court of Appeals summarized the process as follows:

> In evaluating an applicant's condition to determine whether a disability exists, a series of questions are asked in turn. *See* 20 C.F.R. 404.1520(a) etc. If the claimant is presently pursuing work that constitutes gainful activity, then that person is not disabled, even if medically impaired. If the claimant is not presently doing substantial gainful activity, then the question is asked—does the claimant have a severe impairment which significantly limits his physical or mental ability to do basic work activities? If not, there is no disability. If the claimant has a severe impairment, then the question is asked—does that impairment meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, and if it has lasted or can be expected to last for at least 12 months, the person is considered disabled and there is no need to proceed further. If the impairment does not meet or equal a listed impairment, then the question is asked whether the impairment, when considered along with the applicant's residual functional capacity and the physical and mental demands of the job, prevent the applicant from doing past relevant work? If not, then there is no disability. If, however, claimant can not return to past work, the final question is whether the residual functional capacity, age, education, and work experience allow the performance of other work. If not, a finding of disability will be made.

*Kemp v. Bowen,* 816 F.2d 1469, 1474–75 (10th Cir.1987). This case was decided on the basis of the fifth step. At this step, the burden is on the Secretary to show that there is work in the national economy that the plaintiff could perform, taking into account her residual functioning capacity, age, education, and work experience. *Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir.1988). In this case, the ALJ used the testimony of a vocational expert to conclude that plaintiff could perform certain sedentary unskilled jobs. (Tr. 37).

## III. Analysis of Plaintiff's Pain

The plaintiff first contends the ALJ improperly analyzed her pain. The Tenth Circuit Court of Appeals has described the procedure for analyzing pain as follows:

> If a pain-producing impairment is demonstrated by objective medical evidence, the decision maker must consider the relationship between the impairment and the pain alleged. "[T]he impairment or abnormality must be one which 'could reason-

ably be expected to produce' the *alleged* pain." At this stage, the decision maker takes the subjective allegations of pain as true in determining whether they are reasonably related to the proven impairment. He does not evaluate the claimant's credibility. If the nexus between impairment and pain alleged is insufficient, the claimant cannot receive benefits based upon disabling pain. If an appropriate nexus does exist, the decision maker must then consider all the evidence presented to determine whether the claimant's pain is in fact disabling. This evidence includes the medical data previously presented, any other objective indications of the degree of the pain, and subjective accounts of the severity of the claimant's pain. Only at this point may the decision maker decide whether he believes the claimant's assertions of pain.

*Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir.1987) (citations omitted).

The first step requires only a loose nexus between the alleged pain and the medical evidence. "[I]f an impairment is reasonably expected to produce *some* pain, allegations of *disabling* pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence." *Id.* at 164. In this case there is no argument that plaintiff has a medically diagnosed condition that is reasonably expected to produce pain.

At the second step, the ALJ is to consider several factors, including the claimant's credibility, persistent attempts to find relief, willingness to try any treatment prescribed, regular contact with physicians, daily activities, medication, and psychological disorders. *Id.* at 165–66.

■ In this case, although the ALJ cited Social Security Ruling 88–13 rather than *Luna v. Bowen*, he did recite and consider all the relevant factors outlined by the Tenth Circuit.[4] Furthermore, there is substantial evidence to support the ALJ's conclusion that plaintiff does not suffer such pain as

would prevent her from performing sedentary work. Plaintiff suffered a stress fracture in her right ankle in 1991. She underwent various treatments but continued to have problems. Nevertheless, by 1994, her treating physician found she could stand three hours per day and sit eight hours per day. Plaintiff could not perform her past work as a nurse's aide, but that work was at a medium level of exertion. Plaintiff never took any medication for pain other than Tylenol.

## IV. Analysis of Plaintiff's Mental Impairment

The plaintiff next contends that the ALJ's findings regarding her mental impairment are not supported by substantial evidence. The ALJ found that plaintiff suffered no more than mild depression, which was treatable. The only evidence supporting this conclusion is the testimony of Dr. Das, who stated that depression generally is treatable. (Tr. 296). The ALJ rejected the conclusions of Dr. Schell, concluding that he was not acting as a treating physician and that his findings were not supported by objective evidence.

■ Plaintiff argues that the ALJ erred in failing to give Dr. Schell's opinions controlling weight. The court disagrees. Plaintiff was referred to Dr. Schell by her attorney in connection with her application for disability benefits. She did not go to him on her own for treatment, nor was she referred for treatment by a medical professional. Furthermore, Dr. Schell saw plaintiff no more than three times and, according to the record, did no more than make a diagnosis. These are adequate reasons for the ALJ to decline to give Dr. Schell's opinion controlling weight, although it is at least as valuable as that of any other consulting doctor.

■ The court agrees with the plaintiff's final contention: that the ALJ's conclusion

---

4. The plaintiff makes much of the ALJ's citation to Ruling 88–13, which has been rejected by the Fourth Circuit Court of Appeals. *Hyatt v. Sullivan*, 899 F.2d 329 (4th Cir.1990). However, the Tenth Circuit has not rejected the ruling, but has treated it as consistent with *Luna. See Goswick v. Chater*, 76 F.3d 392, No. 95–7090, 1996 WL 50460 (10th Cir.1996); *Riedle v. Sullivan*, 940 F.2d 671, ——, No. 90–7087, 1991 WL 137600 at *5 n. 2 (10th Cir.1991). Moreover, in the context of this ALJ's opinion, it is clear the ALJ did not interpret the ruling as requiring objective evidence of the claimant's degree of pain.

that plaintiff is not disabled by her mental condition is not supported by substantial evidence. In addition to Dr. Schell's opinion that she would not be able to hold a job due to her mental impairments, the opinion of Dr. deWit, the Commissioner's consulting psychologist, supports a finding of disability. Dr. deWit expressed "strong doubts about her ability to sustain concentration over [an] eight-hour day and keep a work schedule with average performance demands." Even Dr. Das, who never examined plaintiff, testified that she "might have difficulty in working in a competitive work setting, particularly when she's very depressed. . . ." (Tr. 294). The ALJ ignored all these statements and instead relied on Dr. Das's single statement that depression generally is treatable.[5] As stated above, this testimony is not substantial evidence supporting the ALJ's decision. Although depression generally is treatable, there is no evidence on the record that this plaintiff's depression and other psychological impairments are treatable. There is no evidence that treatment would eliminate the effects of her condition on her ability to work.[6] *See Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir.1996). Furthermore, the ALJ erred in giving controlling weight to the opinion of Dr. Das, who did not examine plaintiff, over the opinions Dr. Schell and Dr. deWit, who did examine plaintiff, and whose opinions both point to a finding of disability. *Id.* There is no question that a person whose mental condition prevents her from maintaining a regular work schedule and concentrating throughout the day to meet normal performance demands is disabled.

For the foregoing reasons, the court concludes that the ALJ's finding that plaintiff is not disabled is in error. The determination was made at the fifth step, and there is no need for further factfinding. Although plaintiff alleged an onset date of August 1991, the time of her ankle injury, the court has concluded that plaintiff is not disabled by her physical condition alone, but rather by a combination of physical and mental impair-

ments. The appropriate onset date of disability, then, is the date when her mental condition became so limiting that she was no longer able to concentrate over an eight-hour day or keep an appropriate work schedule. According to all the psychological/psychiatric evidence, this occurred at the time of the plaintiff's husband's suicide, December 27, 1992. Therefore, the plaintiff shall be awarded benefits, starting on December 28, 1992.

**IT IS BY THIS COURT THEREFORE ORDERED** that the Commissioner's decision denying plaintiff's application for benefits is hereby affirmed in part and reversed in part. The Commissioner is hereby directed to award benefits, using December 28, 1992, as the onset date of disability.

---

5. The court notes that the ALJ's examination of Dr. Das was leading and tailored to elicit responses that would support a finding of not disabled.

6. Unfortunately, none of the professionals involved in this case has ever explored the efficacy of treating plaintiff's mental condition with medication. Although the court regrets resigning a thirty-one-year-old woman to a life on disability rather than in gainful employment, the court does not have the authority to order this plaintiff to receive treatment for her mental impairments.