Audette KEMP, Plaintiff-Appellant,

v.

Otis R. BOWEN, Secretary of Health and Human Services, Defendant-Appellee.

No. 86–1353.

United States Court of Appeals, Tenth Circuit.

April 24, 1987.

1470

Eric G. Melders and Jack Gray, Oklahoma City, Okl., for plaintiff-appellant.

Marguerite Lokey, Asst. Regional Counsel, Dallas, Tex. (Edwin L. Meese, U.S. Atty. Gen., Washington, D.C., William S. Price, U.S. Atty. W.D. Okl., Gayla Fuller, Chief Counsel, Region VI, and Patrick A. Hudson, Principal Regional Counsel, Social Sec. Disability Litigation Branch, and Joseph B. Liken, Asst. Regional Counsel, Office of the General Counsel, U.S. Dept. of Health and Human Services, Dallas, Tex., were on the brief), for defendant-appellee.

Before LOGAN and SEYMOUR, Circuit Judges, and BROWN, Senior District Judge.*

WESLEY E. BROWN, Senior District Judge.

Plaintiff Audette Kemp sought disability and widow's benefits, claiming that she became disabled in December, 1973. Her application was denied, and she filed this action for review of the final administrative decision of the Secretary. After both parties filed a Consent, the case was transferred to the United States Magistrate for decision. The Magistrate found that the Secretary's ruling was supported by substantial evidence, and the denial of benefits was affirmed. This appeal follows. Because we find that the Secretary's decision was not supported by the requisite evidence, we reverse.

Plaintiff's efforts to establish her disability have a lengthy history, dating back to April, 1974, when she first filed for disability benefits, claiming a disability due to vein insufficiency in her legs since December

* Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

14, 1973. She was first found not to be disabled, but on reconsideration, she was granted a period of disability commencing December 14, 1973 upon a diagnosis of phlebitis.

On June 3, 1983, following a "Notice of Periodic Review," plaintiff's disability payments were terminated upon a finding that her phlebitis was no longer disabling, and that she became able to do substantial work *in June, 1983.* [1]

Plaintiff requested a de novo hearing before an Administrative Law Judge, and a hearing was held on September 29, 1983, at which time plaintiff appeared and testified, represented by counsel. On October 31, 1983, the Administrative Law Judge (ALJ) found that plaintiff's disability had ceased, and on January 26, 1984, the Appeals Council found there was no basis for granting review. Plaintiff did not seek judicial review of this decision.

On January 18, 1984, plaintiff's husband died, and on January 24, 1984, she filed application for widow's disability benefits. After the Appeals Council denied review of her disability claim, plaintiff filed a new application for disability insurance benefits on her own account on January 31, 1984, alleging a disability due to phlebitis since December 14, 1973.

Both of these applications were denied, initially, and upon reconsideration. Plaintiff then requested a de novo hearing on each application, and a hearing was held on October 17, 1984. Again, plaintiff was represented by counsel and testified in her own behalf, and in addition, her personal physician, Dr. H. Jack Brown, appeared and testified concerning her disability. The Administrative Law Judge again determined that plaintiff was not entitled to disability insurance benefits or to widow's disability insurance benefits, because she was able to perform her past clerical work. Thereafter, the Appeals Council determined that there was no basis for granting plain-

tiff's request for review, and this action for judicial review was then filed.

## BACKGROUND

Plaintiff, age 55 at time of the hearing in 1984, has a high school education and one year of commercial courses at a junior college. Her relevant work experience has been as a bookkeeper for a cotton gin, and 10 years working as a billing clerk with the water department of the city of Clinton, Oklahoma. This work included sitting and posting, billing, carrying ledger books, and considerable walking about in waiting on customers. Plaintiff has not been engaged in any substantial gainful activity since December 14, 1973, the onset date for payment of her prior disability benefits, and the alleged onset date of her present application for disability payments.

Since December, 1973, plaintiff has experienced an ongoing series of health problems which began with a "rather severe varicose veins" problem and phlebitis. Dr. Brown, plaintiff's treating physician for over fourteen years prepared several medical reports dating back as early as July, 1973, reflecting vein stripping done in December, of 1968, as well as follow-up ligation and stripping of veins done in August, 1973. In a report dated in 1974, Dr. Brown stated:

"This is to certify that Mrs. Audette Kemp has severe venous insufficiency of her left leg which has required major surgery with only partial relief.

Standing for any period of time produces severe pain in her legs, in spite of the use of elastic stockings. There is no further treatment available for this problem and the patient was advised along in 1973 that she would no longer be able to continue to work for the city of Clinton Water Department because of continued pain.

I would aniticipate that this disability would be permanent and possibly progressive."

---

1. Plaintiff received notice of this action under date of June 3, 1983, but she was allowed to draw benefits through the month of August, 1983. The notice of action stated that "(t)he medical evidence in your case shows that you became able to do substantial gainful work in June, 1983."

In another report dated June, 1974, Dr. Brown recommended Mrs. Kemp avoid all occupations requiring *standing or sitting* for any long period of time.

In 1979 plaintiff again underwent surgery involving right leg vein stripping, and medical reports then reflected that she suffered from recurrent bouts of thrombophlebitis to *both* lower extremities. In a medical report dated September 28, 1983, Dr. Brown again recommended that his patient:

"... avoid any occupation that requires *sitting or standing* for any long period of time. She is to lie flat on her back with her legs elevated for 30 minutes out of every 2 hour period. She is to wear elastic stockings continuously while she is up. She cannot engage in any occupation requiring *sitting or standing* with the legs in a dependant position. For the above stated reasons, this lady is totally disabled from the standpoint of a gainful employment." (Emphasis supplied).

In addition to this evidence, Dr. Brown personally appeared and testified on plaintiff's behalf at the hearing held before the ALJ on October 17, 1984. Because of the decisive nature of this physician's testimony, we quote somewhat at length: (Tr. pp. 61–64)

"... basically (plaintiff) started out with rather severe varicose veins that I first began treating her for, which we went through a series of operations to correct that. And, although I felt that her veins looked pretty good we never seemed to be able to get her legs to stop bothering her. Also along the way she's had esophagealitis hernia that required surgery and hemorrhoids and perhaps one or two other minor conditions.

"I might say, that at the time of her (first) hearing and my last report regarding that hearing, I was not aware of the patient's true diagnosis.... In January of this year she came back into the office complaining of progressive weakness, pain and cramps in her legs, continuing to get worse. I really just could not explain this at all, on the basis of her venous disease in her legs.... I referred her to a young internist in the building in which I was practicing, who suggested that we should do a muscle biopsy. I did a muscle biopsy on ... March the 22nd and this was sent to University Hospital to Special Chemistry Lab there and a report came back that she had no mycolphosphorolaes (phonetics) in her muscles, which is the enzyme that has to do with muscle contractions in sustained activity. And that this was compatible with a condition called McArdle's Syndrome.

"... (McCardle's Disease) it's in a class of diseases called Gylcogen Storage diseases, which has to do with a failure of chemical reactions within the tissues. And in her condition this absence of this enzyme in her muscle means that she has rather profound muscle weakness and— her stamina—her ability to maintain sustained activity is greatly limited. This is an extremely rare disease. I must admit that I had never heard of it until I got this report back and went to text books and did some reading ... The—*to pin down the diagnosis* the patient is put on a treadmill for as long as they can tolerate it, which was done by Dr. Carl Rubenstein, who makes the statement 'her functional capacity is indeed significantly impaired compared with normal sedentary women, because of—although her heart rate went up considerably indicating that she was making a considerable effort to stay on the treadmill, she was unable to do so. For—you know—if she remained on it 3 minutes and 54 seconds which is quite markibly curtailed.[2] Now,

---

**2.** A treadmill exercise test was given by Dr. Carl J. Rubenstein at the request of Dr. Brown to obtain pre and post-exercise lactates as part of the evaluation of McArdles Disease. In his report, dated April 17, 1984, Dr. Rubenstein noted that plaintiff "has been aware of marked weakness and tremulousness with exertion for the past two years, but not previously" and he advised that the test was stopped after 3 minutes 54 seconds of exercise because of weakness and inability to continue walking. Plaintiff reported feeling very weak and quivery, and achieved a heart rate of 170 and maximum exercise pressure of 198/100. Plaintiff's functional aerobic impairment equalled 35% on the sedentary scale. Dr. Rubenstein concluded that:

a normal person, in any sort of exercise situation will have a rise in their blood lactate, which is a by-product of muscle metabolism. In a person with McArdle Syndrome, because this muscle activity ... I mean the chemical activity is not going on in the muscle as it should, they don't have this rise (in) serum ... indeed in Mrs. Kemp, she had a very low lactate level before exercise and the blood drawn immediately after this exercise, there was no rise at all in her blood lactate. *We felt like that this along with the histochemical studies from the University absolutely pinned down this diagnosis of McArdle's Disease.* From everything that I can find out about it, it is chronic, progressive illness that has no known cure or treatment....

"... There's no medicine or operation that can be done.... And on the basis of this, it's my medical opinion that—that this lady is significantly disabled—permanently and should become progressively more disabled as time goes on....

"... I have noted over the last several years a considerable change in her appearance and energy level just in examination in the office. And, what tipped us off to this, is, another thing on her blood chemistry screening the Chem 20, that we do so often. I noted in 1980 that ... an ins-liver exam called a CPK was significantly elevated and at that time we were questioning around nobody seemed to know what was causing that ... and that has ... grown progressively more and more elevated since 1980. Until the time now that it's ... approximately 20 times normal in her blood.[3] And this is a secondary product of her—her muscles working on—in an abnormal fashion producing this abnormal enzyme in her blood just to sustain what she is able to do. Had we been, perhaps, a little more knowledgable or a little smarter, we would have picked this up several years

"In view of the heart rate response, this appears to be a reasonably valid effort for her, and her functional capacity is indeed significantly impaired compared with normal sedentary women of the same age. There were no ischemic findings and arrhythmias."
Exhibit B–27, Tr. p. 284.

ago. As I say, this is an extremely rare condition." (Emphasis supplied.)

Dr. Brown further testified that due to the rarity of McArdles Syndrome, this disease did not appear in the Secretary's Listing of Impairments, which appears at 20 CFR Part 404, Appendix 1, but he did compare plaintiff's impairment to the Secretary's Listings at Section 11.12 (Myasthenia gravis) because plaintiff suffered from significant motor weakness of muscles in her extremities on repetitive activity while on prescribed therapy. The listing of impairments in Appendix I describes impairments which in and of themselves are "considered severe enough to prevent a person from doing *any* gainful activity." (Emphasis supplied.) 20 CFR Sec. 404.1525(a). There, under "Neurological Impairments", we find the following:

"11.12 *Myasthenia gravis.* With:

A. Significant difficulty with speaking, swallowing, or breathing while on prescribed therapy; or

B. Significant motor weakness of muscles of extremities on repetitive activity against resistance while on prescribed therapy."

An impairment which is "medically equivalent" to those listed in the Appendix will suffice "if the medical findings are at least equal in severity and duration to the listed findings." If the impairment is not listed, then the listed impairment "most like" the impairment is considered, and if the applicant has more than one impairment, and none meets or equals a listed impairment, then all symptoms, signs and laboratory findings are to be considered in determining medical equivalency. In all events, the determination of medical equivalence is to be based solely on medical findings. 20 CFR Sec. 404.1526.

In speaking to the question of medical equivalency, Dr. Brown noted that there

3. In March, 1984, plaintiff's lab studies indicated a CPK which was "quite elevated" at 1,660. (Ex. B–23, Tr. 277). A normal reading is less than 100. Plaintiff's readings started at about 1000 in 1980. Testimony of Dr. Brown, Tr. 69.

was no "prescribed therapy" for McArdle's Syndrome, and that in contrast to myasthenia gravis, plaintiff's condition was not episodic—that it was continuous in nature, without interruption, and that the condition was also associated "with extremely painful muscle cramps that do occur in her legs, waking her several times during the night and happening during the day."

In addition to the general muscle weakness and other effects of McArdle's Syndrome, Dr. Brown was also of the opinion that her other medical problems, while not disabling in themselves, contributed to her disablement:

"She has not had documented thrombophlebitis in quite some time. But she is more prone to that. She does have, you know, some impairment of circulation in her legs from her previous varicose veins and the surgery that followed it. All those—this occasional episodes with her hiatus hernia, anxiety attacks based on, you know, because of her chronic medical condition. All of these things add to her medical problems, but in and themselves are not disabling." (Tr. p. 66)

It was Dr. Brown's medical opinion that plaintiff's McArdle's Disease constituted a severe impairment, and that it was growing more severe. In light of the laboratory findings and elevated CPK values he believed that the disease had been present since 1980 and had grown progressively worse since that time.

Plaintiff testified that she lives alone, is able to look after herself, and does a limited amount of housekeeping. She sews, visits on the telephone and sometimes attends church; that she can walk approximately a block or less, can stand 5 to 10 minutes in line at a grocery store, and carry half a bag of groceries into the house. She testified that she can not stand on her feet for any length of time because she tires easily, and that she can not sit for any length of time without elevating her legs. She often has leg cramps and if they come while she is sitting she cannot straighten out her leg. She has to take her leg in her hands and move it herself and lay it out straight. Leg cramps wake her

at night and she cannot move her leg even then—"(i)t won't lift itself up." She has cramps in both legs maybe two or three times a week, and they come when she is standing or walking or laying down. Plaintiff testified that when she sits for too long the circulation is cut off, her legs swell, get numb, and begin to ache. When her legs start swelling, they will swell twice normal size and the swelling will not go down until she lays down at night. Photographs of plaintiff's legs which were received in evidence corroborated this testimony. During the day at home she elevates her legs while in bed or on the divan, and if she sits in a chair, she elevates her legs on a table or foot stool. That is the way she has learned to sit. She sometimes has dizzy spells which occur nearly every day which come when she gets too tired or her legs are hurting and she stops what she is doing and tries to sit or lie down. In plaintiff's words—"It feels like my legs are going to bend out from under me and I'm just going to go down if I don't get to something and lay down or sit down." (Tr. p. 49).

■ In evaluating an applicant's condition to determine whether a disability exists, a series of questions are asked in turn. See 20 C.F.R. Sec. 404.1520(a) etc. If the claimant is presently pursuing work that constitutes gainful activity, then that person is not disabled, even if medically impaired. If the claimant is not presently doing substantial gainful activity, then the question is asked—does the claimant have a severe impairment which significantly limits his physical or mental ability to do basic work activities? If not, there is no disability. If the claimant has a severe impairment, then the question is asked—does that impairment meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, and if it has lasted or can be expected to last for at least 12 months, the person is considered disabled and there is no need to proceed further. If the impairment does not meet or equal a listed impairment, then the question is asked whether the impairment, when considered along with the applicant's residual functional capacity and the physical and

mental demands of the job, prevent the applicant from doing past relevant work? If not, then there is no disability. If, however, claimant can not return to past work, the final question is whether the residual functional capacity, age, education, and work experience allow the performance of other work. If not, a finding of disability will be made.

In the case of Mrs. Kemp, the ALJ concluded that she did have a significant impairment, as defined in 20 C.F.R. Sec. 404.-1521, but that this impairment did not meet or equal the severity of any impairment listed in Appendix 1 to Subpart P of the Regulations. He also determined that Mrs. Kemp was able to perform sedentary work "lifting no more than ten pounds at a time and occasionally lifting or carrying articles such as docket file, ledgers and small tols, and (that she) can function within these restrictions without experiencing significant pain," so that she retained the capacity to perform her past relevant work, within the provisions of 20 C.F.R. Sec. 404.-1520(e). In particular the ALJ found "that claimant does have some muscle weakness in her lower extremities and it is possible she may have McArdle's syndrome. However, the muscle weakness has not been specifically diagnosed yet and her condition is still in the very early stages and the symptoms remain mild." (Tr. p. 17).

The only question in this appeal is whether or not the findings of the ALJ, as adopted by the Secretary, are supported by substantial evidence. 42 U.S.C. Sec. 405(g)(1982). Our standard of review was recently explained in *Jozefowicz v. Heckler*, 811 F.2d 1352 (10th Cir.1979):

> "The meaning of 'substantial evidence' has been explained by the Supreme Court in *Richardson v. Perales*, 402 U.S. 389, 401 [91 S.Ct. 1420, 1427, 28 L.Ed.2d 842] (1971), as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 [59 S.Ct. 206, 216, 83 L.Ed. 126] (1938)). As this court has observed, we neither weigh the evidence nor substitute our discretion for that of the agen-

cy. *Cagle v. Califano*, 638 F.2d 219 (10th Cir.1981). *Nonetheless, the evidence must have some substance to it.*" (Emphasis supplied.)

In another recent case, *Talbot v. Heckler*, 814 F.2d 1456 (10th Cir.1987) we also noted that while we must review the record as a whole, "the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *See also George W. Frey v. Bowen*, 1987, 816 F.2d 508 (10th Cir.1987).

■ After a review of the record in this case, we must conclude that the Secretary's findings are not supported by substantial evidence. We have quoted the testimony of Dr. Brown at great length because his testimony and medical reports were in effect the sole relevant medical evidence bearing upon Mrs. Kemp's medical situation. Dr. Rubenstein's report on the treadmill examination, and the laboratory reports of elevated CPK levels, both corroborated Dr. Brown's testimony, and supported his diagnosis that Mrs. Kemp was afflicted with McArdle's Disease, an impairment medically equivalent to Myasthenia gravis, a Listed Impairment. In the face of this evidence, the ALJ found that Mrs. Kemp's "muscle weakness has not been specifically diagnosed yet", and that her impairment did not meet or equal the severity of any listed impairment in Appendix I. His findings were not supported by any medical evidence in the record, and thus represent the personal medical opinion of the ALJ.

The finding that Mrs. Kemp is able to perform sedentary work and to return to her former vocation is likewise without support in the record. While the ALJ agreed that plaintiff's impairments limited her ability to stand or to walk in a vocational environment, he totally ignored all of the medical evidence which established that she was also unable to *sit* for any length of time because of circulatory problems associated with vein stripping and surgery on her legs. In this respect the ALJ finding is similar to that which we reversed in *Joze-*

*fowicz v. Heckler, supra,* 811 F.2d at 1358, where we noted that:

"The ALJ, in determining that the claimant retained the residual functional capacity for sedentary work, apparently accepted the judgments of the treating physicians that the claimant could not do work that involved prolonged walking or standing, while simultaneously rejecting their judgments that she also could not do work that involved prolonged sitting. No reason was given for accepting part of their findings and rejecting the other part. . . .

"This court requires that good cause be given for rejecting the treating physicians' views, and '(i)f the opinion of the claimant's physician is to be disregarded, specific, legitimate reasons for this action must be set forth.' *Byron v. Heckler,* 742 F.2d 1232, 1235 (10 Cir.1984); *Turner v. Heckler,* 754 F.2d 326 (10 Cir. 1985). . . . Here, however, no explanation at all was given. The ALJ simply stated that 'the medical evidence of record does support a finding that claimant would be capable of performing sedentary work.' . . . Nor is there any explanation of what that specific medical evidence is, and the ALJ's prior recitation of various medical findings does not remedy this defect."

In the two recent cases from this Circuit, *Jozefowicz v. Heckler,* and *Talbot v. Heckler, supra,* medical evidence was provided by consulting physicians retained by the Social Security Administration in addition to evidence provided by the claimants' treating physicians. In each case, we cited the rule that the treating physician's opinion is entitled to decisive weight. The treating physician rule has been described in *Schisler v. Heckler,* 787 F.2d 76, 81 (2d Cir.1986) in this manner:

"The treating physician rule governs the weight to be accorded the medical opinion of the physician who treated the claimant ... relative to other medical evidence before the fact-finder, including opinions of other physicians. The rule, which has been the law of this circuit for at least five years, provides that a treating physician's opinion on the subject of medical disability, i.e., diagnosis and nature and degree of impairment, is: (i) binding on the fact-finder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians, although resolution of genuine conflicts between the opinion of the treating physician, with its extra weight, and any substantial evidence to the contrary remains the responsibility of the fact-finder." [4]

In the case of Mrs. Kemp there was not even evidence from a consulting physician retained by the agency to contradict the medical diagnosis, findings, and conclusions of her treating physician, Dr. Brown. While the ALJ is authorized to make a final decision concerning disability, he can not interpose his own "medical expertise" over that of a physician, especially when that physician is the regular treating doctor for the disability applicant. See *Broadbent v. Harris,* 698 F.2d 407 (10th Cir.1983); *Cavitt v. Schweiker,* 704 F.2d 1193 (10th Cir. 1983); and see *Knipe v. Heckler,* 755 F.2d 141 (10th Cir.1985).

The findings of the ALJ that Mrs. Kemp's impairments did not meet or equal the severity of any impairment listed in Appendix 1 to Subpart P of the Regulations, and his additional finding that she retained the capacity to perform her past sedentary clerical work are not supported by substantial evidence. While step 5 of the evaluation process was never reached in this case, it is clear from the record that Mrs. Kemp did not retain the ability to perform any range of sedentary acitvity which would require any amount of standing, walking or sitting, and no useful purpose would be served by remanding the case to the Secretary for evidence of possi-

---

4. For many years, the Secretary refused to follow the treating physician rule so that cases reversing SSA in district courts and the Second Circuit were "almost legion." The Secretary has recently announced that the rule will be followed throughout the United States. *See Stieberger v. Bowen,* 801 F.2d 29, 36 (1986); *Schisler v. Heckler, supra,* 787 F.2d at pp. 82–84.

ble vocational options. *Jozefowicz v. Heckler, supra,* 811 F.2d 1352.

Mrs. Kemp is hereby found to have a disability as defined by the SSI regulations.

The case is remanded for an immediate award of disability benefits from September 1, 1983, the date when her prior disability benefit payments were terminated.

REVERSED and REMANDED.