Joe Ann GUMM, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security Defendant.

No. CIV.A. 96–1416–JTM.

United States District Court, D. Kansas.

Aug. 25, 1998.

David H. M. Gray, Gragert, Hiebert & Gray, Wichita, KS, for Plaintiff.

Emily B. Metzger, Office of U.S. Atty., Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

This is an action for judicial review of a final agency determination by the Social Security Administration denying plaintiff's application for disability benefits. The court has considered the briefs filed by the plaintiff and the Commissioner, as well as the administrative record and the applicable law, and is prepared to rule.

### I. Factual and Procedural Background

On November 23, 1993, plaintiff filed an application for disability benefits under Title II, 42 U.S.C. §§ 401 *et seq.* (Tr. 41–43). She alleged an onset date of disability of November 2, 1982. The Commissioner denied plaintiff's claim initially and on reconsideration. (Tr. 45–47; 51–54). Plaintiff received an administrative hearing on October 24, 1995. (Tr. 267). Plaintiff was represented by counsel at the hearing. (Tr. 269). On December 15, 1995, the Administrative Law Judge ("ALJ") issued a ruling finding that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 11–23). The Appeals Council denied plaintiff's request for review. (Tr. 4–5). Thus, the decision of the ALJ rests as the Commissioner's final determination.

The plaintiff was born on January 20, 1937. She was forty-eight years old at the time her insured status expired, on March 31, 1985. (Tr. 11, 20). However, by the time of the administrative hearing, she was fifty-eight years old. (Tr. 285). She has an eighth-grade education. (Tr. 286). Plaintiff was married in 1952 at age fifteen. (Tr. 42). Her husband is disabled. (Tr. 182). The plaintiff has work experience as a waitress and as a cleaner. (Tr. 63, 266). She has not engaged in any substantial gainful activity since the alleged onset date of disability, November 2, 1982. She did, however, have two unsuccessful work attempts in 1986. (Tr. 286–87).

Plaintiff alleges she is disabled due to a combination of obesity and complications from a stomach stapling procedure, orthopedic problems and mental impairments. (Tr. 12).

Plaintiff's primary treating physician since 1981 has been Dr. Terry Summerhouse. Since 1981, plaintiff has made numerous visits to Dr. Summerhouse complaining of gastric problems (including nausea, vomiting and dizziness), heart problems, depression and anxiety, pain in her neck, hip, back, leg and knee, as well as a number of injuries and routine illnesses. (Tr. 84–132). Dr. Summerhouse made notes of these complaints and his corresponding findings. For plaintiff's pain, he prescribed Motrin 600 and Elavil on occasion (Tr. 89, 111, 118) and Tylenol III repeatedly over the course of his treatment of plaintiff. (Tr. 86, 88, 90, 92, 97, 98–99, 103, 105, 107–119). To treat depression and anxiety, he prescribed Prozac in 1989 and 1991 and Xanax in 1993. (Tr. 88, 91, 95). Depression and anxiety were noted in the early 1980s, but it is unclear what, if any, medications were prescribed.

As for plaintiff's obesity and gastric problems, the plaintiff underwent a stomach stapling operation in June 1982. This operation was performed by Dr. VinZant. (Tr. 140). Plaintiff is 5'2" tall and at the time of the procedure weighed 175 pounds. (Tr. 140). Plaintiff lost weight after the procedure, but complained of frequent vomiting. (Tr. 139–

40). In July 1984, plaintiff underwent an esophagogastroduodenoscopy; it was found that plaintiff's gastric outlet was somewhat narrowed due to scar tissue. (Tr. 149). In December 1983, she weighed 133 pounds, but by September 1984, her weight was back up to 157 pounds. (Tr. 138–39). In March 1985, plaintiff had additional surgery to replace torn staples and to take down adhesions of the stomach to the liver. (Tr. 151–54). Plaintiff continued to have problems with vomiting and by September 1985, she weighed 113 pounds. (Tr. 135). Plaintiff was again hospitalized for surgery to remove a piece of food which had lodged in her stomach. (Tr. 155). Plaintiff was admitted to the hospital again in May 1986 for esophagogastroscopy with dilation of banded gastroplasty. (Tr. 134).

Plaintiff testified that since the 1986 surgery, her episodes of vomiting have decreased. Nevertheless, she contends that once every two or three months, she has a vomiting spell that lasts three days. (Tr. 292). In addition, she has one- to two-day episodes once or twice a month, and two or three times a month she has vomiting that lasts less than a full day. (Tr. 292). She testified that nervousness, depression and fatigue can cause her to vomit. (Tr. 293). She testified that her vomiting is so frequent that she cannot eat a meal away from home. (Tr. 292).

The medical records reflect a history of heart palpitations. Beginning in 1993, plaintiff has reported to the hospital on several occasions complaining of heart palpitations and chest pain. (Tr. 82, 173, 182, 245). Plaintiff testified that she has taken heart medications since 1982 and that these medications controlled the problem until 1993. (Tr. 297–98).

At the hearing, plaintiff testified that she experiences constant hot, burning pain in her lower back, right hip and leg. (Tr. 293). Occasionally, the pain is sharp, but she has at least some pain every day. (Tr. 293). She also has pain in her right knee, accompanied by swelling. (Tr. 294). She testified that she cannot stand for more than ten minutes, at which time she sits in her recliner and props her leg up for at least twenty minutes. (Tr. 294–95). If she takes pain medication, the pain is gone after thirty to forty minutes.

(Tr. 294). She testified that she used to paint ceramics, but now she can only work for twenty minutes, then must move around, then rest for twenty or more minutes. (Tr. 295–96). She testified that her sitting and standing tolerance has been about the same since she quit working in 1980. (Tr. 296).

Plaintiff received chiropractic treatment from 1990 to 1994. (Tr. 160–172). She was treated for right leg pain and back pain. (Tr. 163, 171). On the patient form for the chiropractor, plaintiff reported nervousness. (Tr. 171).

Plaintiff testified to a history of depression beginning in 1980, when her brother was killed in a steam boiler explosion. (Tr. 298). In 1982 plaintiff's daughter was killed when her house exploded. (Tr. 298). In 1983, plaintiff was involved in a custody battle. She testified that by 1984, her depression was as bad as it was at the time of the hearing. (Tr. 299). Plaintiff testified that she cries every day and has trouble sleeping. (Tr. 299). She also testified to decreased energy, nervousness, shaking and anxiety. (Tr. 302). Plaintiff testified that since 1984, she does not wear makeup and there are two or three days a week that she does not even get dressed. (Tr. 300, 302–03). She has appetite disturbances, either snacking constantly or not wanting to eat at all. (Tr. 300). She testified that she was once a pretty good housekeeper, but now does not even care about keeping up with housework. (Tr. 301). On a form filed with Social Security, plaintiff reported that she has no hobbies other than watching television and shopping once a week with her daughter. (Tr. 72). She seldom drives. (Tr. 72).

Plaintiff never saw a counselor until 1994, after she had filed for disability benefits. (Tr. 187–93). She told her counselor she had experienced a lot of mood swings and crying since 1980, but that it had been worse since her mother died in 1993. (Tr. 191–92). She did, however, complain of depression to Dr. Summerhouse in the early and mid 1980s and asked him to prescribe "something for nerves." (Tr. 106, 113, 114, 120). As stated above, Dr. Summerhouse has put plaintiff on anti-depressant medications from time to

time. There is no indication in his notes how plaintiff responded to these medications.

The administrative hearing included the testimony of Dr. Earl Witt as a medical expert. (Tr. 270). Dr. Witt testified that the records warranted the following diagnoses as of March 31, 1985: obesity; borderline hypertension; and a pattern of taking a lot of Tylenol III. (Tr. 272). Dr. Witt testified he believed plaintiff's continued use of Tylenol III over a period exceeding ten years may indicate a dependency. (Tr. 277–78). However, this dependency did not lead to any functional restrictions. (Tr. 280). Furthermore, uncomplicated obesity does not cause any restrictions. (Tr. 279). Dr. Witt testified that the heart problems listed by Dr. Summerhouse in his letter are unsubstantiated by the record, at least as of March 1985. (Tr. 273–77). He testified the record does not support a claim of chronic digestive problems. (Tr. 281). Dr. Witt testified that plaintiff's claims of depression and panic disorder are not corroborated, as there was no psychiatric evaluation before 1994. (Tr. 282).

Dan Goldstein testified as a vocational expert at plaintiff's administrative hearing. (Tr. 307). The ALJ asked Goldstein to consider a person of plaintiff's age, education and work experience who is obese and has a dependency on prescription medication. (Tr. 308–09). Goldstein testified that neither excess weight nor pain is necessarily disabling. (Tr. 309). The ALJ asked Goldstein to assume the person could lift fifty pounds occasionally or twenty-five pounds frequently, that there was no marked reduction in standing tolerance, that the person could not do more than moderate bending or stooping, nor more minimal kneeling and crawling, and that the person required ready access to bathroom facilities. (Tr. 309–10). Goldstein testified these limitations would be consistent with plaintiff's past work. (Tr. 310). A limitation to eating at home would have no effect on the plaintiff's ability to work. (Tr. 310). A limited ability to recall substantial amounts of data or to adjust to differing situations would not prevent past work. (Tr. 311). If plaintiff could only perform basic, simple and routine tasks, then the semi-skilled base would be eliminated, but she could perform sedentary, light, or medium unskilled work, a base of 2500 jobs. (Tr. 312).

On October 4, 1994, Dr. Summerhouse wrote a letter to plaintiff's counsel. (Tr. 201–02). Dr. Summerhouse wrote that plaintiff had been under his care for a number of years before her insured status expired. (Tr. 202). Dr. Summerhouse stated that all of plaintiff's problems have existed since before March 31, 1985. (Tr. 201). Dr. Summerhouse stated that plaintiff had a history of heart problems, depression, anxiety and orthopedic problems. (Tr. 201). Dr. Summerhouse expressed the opinion that the orthopedic problems in combination with the emotional problems were disabling before March 1985. (Tr. 201). He stated that her complaints of pain were credible, particularly in light of the fact that her depression would increase her perception of pain. (Tr. 201). She would be limited to brief periods of sitting or standing and need to recover in between. (Tr. 201). Furthermore, he stated her pain level would fluctuate to the point where she could not be a reliable worker. (Tr. 201).

The ALJ found plaintiff's obesity and status post stomach stapling caused significant vocational restrictions, but the medical records did not support a finding that any other impairments were significantly limiting by the time plaintiff's insured status expired. (Tr. 12). He rejected Dr. Summerhouse's letter and his early diagnoses as being unsubstantiated by clinical tests. (Tr. 12). He concluded plaintiff's lumbar problems were not severe enough to pose the limitations described by plaintiff. (Tr. 13). He noted plaintiff's medications, but found there was no support in the medical record for plaintiff's claims of daily, debilitating pain. (Tr. 18). "The documentation shows that she has no significant spinal, lumbar or knee abnormalities that would produce back, knee, leg or hip pain to the degree alleged." (Tr. 18). He then found plaintiff's testimony was not credible as it was inconsistent with the evidence in the record. (Tr. 18).

The ALJ noted the medical expert's testimony that plaintiff may have been dependent on Tylenol III, but that this did not cause any psychiatric problems. (Tr. 14). The ALJ believed plaintiff had some degree of depression since 1984, but found it not severe

because plaintiff had not been referred for counseling, and there was no detailed examination of plaintiff's psychological condition until February 1994. (Tr. 15). He filled out a Psychiatric Review Technique Form on which he found plaintiff had dysthymia, i.e., mild depression characterized by fewer symptoms than major depression. (Tr. 25). The ALJ found plaintiff had "decreased energy, possible due to digestive difficulties," and "difficulty concentrating or thinking." (Tr. 24–25). He found the following symptoms, and others, absent: "anhedonia or pervasive loss of interest in almost all activities;" "appetite disturbance with change in weight;" and "sleep disturbance." (Tr. 24–25). He found plaintiff's mental condition caused no restrictions on activities of daily living and no difficulties in maintaining social functioning, seldom caused deficiencies of concentration, persistence or pace, and never led to episodes of deterioration or decompensation in work or work-like settings. (Tr. 25–26).

## II. Applicable Standards

■ The standard of review in this case is established by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...." Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Fowler v. Bowen,* 876 F.2d 1451, 1453 (10th Cir.1989). It is not the duty of the court to reweigh the evidence, or substitute its decision for that of the ALJ. *Talbot v. Heckler,* 814 F.2d 1456, 1461 (10th Cir.1987). Substantial evidence, however, must be more than a mere scintilla. *Perales,* 402 U.S. at 403, 91 S.Ct. 1420. This court's determination entails a review of "the record as a whole, and 'the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Talbot,* 814 F.2d at 1461. (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). In applying these standards, the court must keep in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir.1965).

■ The Commissioner uses a five-step process for deciding whether a Social Security claimant is disabled. The Tenth Circuit Court of Appeals summarized the process as follows:

In evaluating an applicant's condition to determine whether a disability exists, a series of questions are asked in turn. *See* 20 C.F.R. 404.1520(a) etc. If the claimant is presently pursuing work that constitutes gainful activity, then that person is not disabled, even if medically impaired. If the claimant is not presently doing substantial gainful activity, then the question is asked—does the claimant have a severe impairment which significantly limits his physical or mental ability to do basic work activities? If not, there is no disability. If the claimant has a severe impairment, then the question is asked—does that impairment meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, and if it has lasted or can be expected to last for at least 12 months, the person is considered disabled and there is no need to proceed further. If the impairment does not meet or equal a listed impairment, then the question is asked whether the impairment, when considered along with the applicant's residual functional capacity and the physical and mental demands of the job, prevent the applicant from doing past relevant work? If not, then there is no disability. If, however, claimant can not return to past work, the final question is whether the residual functional capacity, age, education, and work experience allow the performance of other work. If not, a finding of disability will be made.

*Kemp v. Bowen,* 816 F.2d 1469, 1474–75 (10th Cir.1987). This case was decided on the basis of the fifth step. At this step, the burden is on the Commissioner to show that there is work in the national economy that the plaintiff could perform, taking into account plaintiff's residual functioning capacity, age, education, and work experience. *Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir.1988). In this case, the ALJ used voca-

tional expert testimony to conclude that plaintiff could perform some work in the sedentary, light and medium unskilled ranges. (Tr. 22–23).

### III. Analysis of Claim

The plaintiff here contends the ALJ erred in his analysis of plaintiff's pain and stomach problems. She contends further that the ALJ erred in not giving controlling weight to the opinion of her treating physician, Dr. Summerhouse, as expressed in his October 1994 letter.

 The plaintiff alleges she is disabled in part because of pain in her neck, back, hip, leg and knee. *Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir.1987), provides the framework under which claims of disabling pain are to be analyzed. Under *Luna,* the decision maker first must determine whether a given impairment could be reasonably expected to produce the type and degree of pain cited by a claimant. *Id.* At this step, only a loose nexus between the impairment and the claimed pain is required. *Id.* If an impairment is reasonably expected to produce some pain, allegations of disabling pain emanating from that impairment are sufficiently consistent to proceed to the second step. *Id.* 834 F.2d at 164. At the second step, the decision maker must consider all the evidence to determine whether the claimant's pain is disabling. *Id.* At the second step, the ALJ is to consider several factors, including the claimant's credibility, persistent attempts to find relief, willingness to try any treatment prescribed, regular contact with physicians, daily activities, medication, and psychological disorders. *Id.* 834 F.2d at 165–66. The decision maker may consider the credibility of the claimant's assertions of severe pain only at the second step of the process. *Id.* 834 F.2d at 164.

The plaintiff makes much of the ALJ's citation to Ruling 88–13, which was rejected by the Fourth Circuit Court of Appeals. *Hyatt v. Sullivan,* 899 F.2d 329 (4th Cir. 1990). The Fourth Circuit held the ruling improperly required a claimant to provide objective medical evidence of the degree of pain suffered. *Id.* However, the Tenth Circuit has not rejected the ruling, but has treated it as consistent with *Luna. See Goswick v. Chater,* No. 95–7090, 76 F.3d 392, 1996 WL 50460 (10th Cir.1996); *Turnage v. Shalala,* No. 93–7071, 19 F.3d 1443, 1994 WL 83351 at *2 (10th Cir.1994).

 In this case, the ALJ recited the proper standard for analyzing pain, listed the factors to be considered at the second step of the analysis, and found there was a loose nexus between the impairment and the level of pain alleged. However, at the second step, the ALJ failed to consider all the relevant factors. Instead, he found the medical evidence did not corroborate the plaintiff's claim. For that reason, he found her testimony lacked credibility. The only other factor mentioned was a listing of plaintiff's medications, but the ALJ did not discuss how those medications bore on plaintiff's claims of pain. Not mentioned at all were plaintiff's limited daily activities, her frequent trips to Dr. Summerhouse and other medical professionals, or, most importantly, her mental impairment.

Dr. Summerhouse stated his opinion that plaintiff's depression and anxiety had an impact on her perception of pain. He stated that plaintiff's claims of pain were credible in light of the medical evidence, including a finding of right side scatia, and the impact of plaintiff's mental impairment. Dr. Summerhouse further stated that plaintiff's condition had not deteriorated since 1985, and that she would be limited to brief periods of standing or sitting with the need to recover in between. The vocational expert testified that this limitation would preclude employment. (Tr. 316). The ALJ rejected Dr. Summerhouse's letter.

 The Commissioner is to give great weight to the opinions of a claimant's treating physician, unless reasons are specified for rejecting the treating physician's diagnosis. *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir.1984). The testimony of a treating physician may be discounted where his conclusions are not supported by specific findings. *Washington v. Shalala,* 37 F.3d 1437 (10th Cir.1994). Furthermore, ALJ need not give controlling weight to a physician's opinions on matters outside his field of expertise. *Turley v. Sullivan,* 939 F.2d 524, 527 (8th Cir.1991). Therefore, a treating physician's opinion on the ultimate question of disability

is not entitled to deference because that question turns on vocational factors as well as medical findings. *See id.*

■ In this case, then, the ALJ properly disregarded some Dr. Summerhouse's letter. Dr. Summerhouse's statements regarding plaintiff's heart condition are contradicted by test results and the opinions of other treating physicians. Even plaintiff admits her heart condition was controlled until 1993. Furthermore, Dr. Summerhouse's statement that plaintiff was disabled is not entitled to any particular weight.

■ Nevertheless, the ALJ erred in rejecting the remainder of Dr. Summerhouse's letter. The ALJ did not find any of the impairments listed by Dr. Summerhouse, but only those mentioned in the testimony of Dr. Witt, who had not examined plaintiff at all. Dr. Summerhouse had treated plaintiff since the early 1980s. He had seen her on a frequent basis and was in the best position to judge whether her claims of pain, depression and anxiety are credible or whether plaintiff was malingering. He believes plaintiff is credible. Furthermore, his opinions regarding plaintiff's orthopedic impairments are supported by medical findings. His opinions regarding depression are corroborated by references in the medical record to depression, "nerves," and various medications prescribed. It is corroborated further by evidence of experiences, including the tragic deaths of her brother in 1980 and her daughter in 1982, which could reasonably be expected to cause major depression. Plaintiff testified to and discussed during her psychiatric evaluation mood swings and crying since 1980. For these reasons, the ALJ should have given Dr. Summerhouse's opinion controlling weight on the issues of pain and mental impairment. The court concludes that the ALJ's determination that plaintiff could sit/stand long enough to perform substantial gainful activity is not supported by substantial evidence.

■ Finally, the ALJ improperly categorized plaintiff's limitations from her stomach impairment. The ALJ stated that plaintiff testified she vomits once every three months. He, therefore, found she could be accommodated by limiting her to work with ready access to a bathroom. In reality, plaintiff testified that once every three months she has vomiting spells that last three full days. In addition, she testified to episodes lasting from thirty minutes to two days about four times per month. This condition would be incompatible with substantial gainful employment. Such frequent absences are unacceptable to employers.

■ For the foregoing reasons, the ALJ's determination that plaintiff was not disabled by a combination of orthopedic problems, resulting pain, gastric problems, and mental impairment is not supported by substantial evidence. Giving these impairments their proper analysis, the evidence supports the conclusion that plaintiff suffers a combination of impairments that prevents her from sitting or standing long enough and from maintaining a sufficiently regular work schedule to engage in substantial gainful activity. Accordingly, the court reverses and remands to the Commissioner with directions to award disability benefits to the plaintiff.

Having concluded that plaintiff is disabled under the definition in the Social Security Act, the court notes with some concern what appears to be a lack of effort to provide plaintiff aggressive treatment in favor of simply medicating her and labeling her disabled. Particularly disturbing is regularly prescribing Tylenol III for the plaintiff for more than fifteen years. The medical expert testified that this indicates a likely dependence on the drug. According to the Physician's Desk Reference, 52nd ed. (1998), dizziness, nausea and vomiting are among the most common adverse reactions to this drug. *Id.* at 2062. Other reactions include euphoria and *dysphoria.* *Id.* Apparently, given the silence in the record, no one has addressed what, if any, impact plaintiff's continued use of Tylenol III may have had on her physical and emotional symptoms. Additionally, depression was noted starting in the early 1980s, which diagnosis is not surprising given the tragic personal losses plaintiff had suffered in that time frame. Nevertheless, plaintiff was occasionally prescribed anti-depressants, but was never referred for counseling or other psychological care until after she had filed for Social Security benefits. Perhaps with more aggressive and comprehensive treatment,

plaintiff's condition could have been alleviated to the point where she could have engaged in substantial gainful employment. However, the court is not in a position to prescribe treatment and cannot punish the plaintiff for never receiving treatment which was not offered to her. The plaintiff had frequent contact with her physicians and, according to the record, followed their orders. There was no more she could be expected to do. On the record before the court, the only conclusion to be reached is that plaintiff was disabled, as of no later than November 2, 1982, by a combination of mental and physical impairments.

**IT IS BY THIS COURT THEREFORE ORDERED** that the Commissioner's decision denying plaintiff's application for benefits is hereby reversed, and this action is remanded to the Commissioner with directions to award disability benefits to plaintiff as of the alleged onset date of disability, November 2, 1982.