Vera M. SCHMIDT, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security, Defendant.

No. 97–1140–JTM.

United States District Court, D. Kansas.

Feb. 9, 1999.

**1292**

David H. M. Gray, Gragert, Hiebert & Gray, Wichita, KS, for Plaintiff.

Emily B. Metzger, Office of United States Attorney, Wichita, KS, for Defendant.

### MEMORANDUM ORDER

MARTEN, District Judge.

This is an appeal from a determination of non-disability by plaintiff Vera Schmidt. Schmidt applied for disability benefits on July 11, 1994, stating that she had become disabled on February 16 of that year. The claim was denied initially and on reconsideration. An Administrative Law Judge denied her claim on January 26, 1996. He determined that Schmidt was unable to return to her former employment, but that she could perform other work in the national economy. Schmidt's appeal from this decision was denied on February 12, 1997. She then instituted the present action.

At the time of the hearing before the ALJ, Schmidt was 53 years old. She had a high school education, and had worked as a print shop worker, a bookkeeper, and a gas station attendant. After the date of her alleged disability, she briefly returned to the print shop on a part-time basis. She has not engaged in any substantial gainful activity at any time since February 16, 1994.

On February 7, 1994, Schmidt saw a chiropractor, Stephen Dent, complaining of pain in the thoracic and lumbar areas. Dent reported a "decreased" range of motion in these areas, and wrote in his notes that Schmidt had "[a]cute moderate thoracic strain." (R. 144). He prescribed ice packs and scheduled Schmidt for another visit in two days. Schmidt continued to see Dent on several occasions up to January 20, 1995.

Schmidt contacted Dr. Ted R. Cook, her family physician, on March 8, 1994. Dr. Cook reported that "Vera is in today wanting an evaluation of her back pain for Workman's Comp." (R. 101). He noted that Schmidt had been seeing Dent who was treating a rib between her scapula, "usually get[ting] the rib popped back in place when she is in his office [but] as soon as she gets home she does something and it pops right back out." (Id.) She reported back pain, but stated that it "seems to be much better" since she began taking Flexeril, which she took at night because it made her drowsy. Dr. Cook examined Schmidt and found "very tender areas" near the spine. (Id.) He found no neurologic deficits and no paresthesia. He prescribed Lodine 300 mg. for Schmidt to take with the Flexeril.

Dr. Cook saw Schmidt on a number of occasions during 1994. On March 11, Dr. Cook reported that Schmidt stated she was continuing to see Dent for her lumbar strain and that she was "60 to 70% improved." Dr. Cook's examination indicat-

ed "moderate spasm" in the lumbar region, and that Schmidt had "good range of motion." (Id.) He advised her to modify her work activities so that she didn't have to lift so much and to exercise. On May 2, he reported that Schmidt showed "significant spasm" in the thoracic region, but did not show any tenderness in the joints or lumbar region. (Id.). Schmidt visited Dr. Cook's office on June 16 stating she was having trouble breathing and that she was "feeling like she has pneumonia." (R. 100). On June 23, she saw Dr. Cook, who wrote that Schmidt presented three major complaints—the pneumonia, thoracic sprain, and skin lesions. Schmidt told Cook that the sprain "continues to bother her but this is getting slowly better" with physical therapy. (Id.)

On May 4, 1994, Schmidt had seen orthopedist Dr. Jay Stanley Jones. Dr. Jones found Schmidt's X-rays showed some thoracic area spinal degeneration. He wrote that Schmidt had "a chronic over use syndrome seeing that she gets better over the weekends and then when she returns to work she gets worse." (R. 161). He decided to keep Schmidt off work for a week and prescribed Feldene. "If this resolves her symptomatology," he wrote, "I am going to recommend a job change." (Id.)

In May Schmidt reported to Dr. Jones that there was little change in her condition, although she was "a little bit better." (R. 160). On June 22, she saw Dr. Jones complaining of "increasing back pain" which was "localized over the scapula." (Id.) This was during the time she had reported to Dr. Cook's office with pneumonia, and had been taken off her muscle relaxants and anti-inflammatories while that condition was treated. To compensate, Dr. Jones scheduled some trigger point injections for Schmidt.

In August, Schmidt reported that her back condition hadn't changed, that she felt it was "as good as she is going to be" and that she wanted to schedule a functional capacity examination. (R. 151). On September 29, Dr. Jones wrote that Schmidt should sit at a desk or stand in one position for "brief periods" only. She should not use a keyboard or do bookkeeping or other repetitive work with her hands. However, Dr. Jones also indicated that Schmidt's "impairment rating" for her back was only 8%. (R. 149).

The hearing before the ALJ was conducted on September 27, 1995.

Subsequent to the hearing, on November 1, 1995, Dr. Jones summarized his findings regarding Schmidt in a letter to her attorney. He wrote that Schmidt was being seen for severe shoulder pain, as well as carpal tunnel syndrome. He concluded that he did not believe Schmidt could perform even sedentary work because of her pain, which limited her to sitting for 10 minutes, and then standing or walking around for 10 minutes. She could lift 5 to 10 pounds frequently, and 20 pounds occasionally. She had an "impingement syndrome" which restricted her ability to perform grasping, gripping, and reaching motions with her hands. (R. 264).

Dr. Jones referred Schmidt to Dr. Frederick Wolfe. On October 7, 1996, Dr. Wolfe found indications of fibromyalgia in the number of tender points found and the presence of pain in all four body quadrants. Dr. Wolfe also noted that Schmidt did not have substantial fatigue or sleep disturbance, which are also characteristic of fibromyalgia. Dr. Wolfe found mild osteoarthritis of the knee and hand. He concluded that "this mixture of osteoarthritis and fibromyalgia ... is probably causing most of her problems." (R. 267).

Schmidt testified at the hearing, stating that her pain is a dull pain in the upper part of her back. Schmidt testified that the pain becomes a stabbing pain when she stands for 10 minutes, does dishes, sits in a work position for 10 to 15 minutes, or lifts too much. When this happens, she sits in her recliner for 45 minutes to an hour. She can then resume work for a shorter

period of time than she would have been able to perform but for the onset of the stabbing pain.

She also gets headaches that begin in her neck and move up. She treats these headaches with over-the-counter medications and sitting in her recliner. She spends approximately 5 hours a day in her recliner.

Her hands and fingers get tingly and numb on occasion. Her hands hurt when her back hurts or when she has been using them. She often drops things and can no longer crochet. She continues to needlepoint, which she can do for 45 minutes, after which she relaxes in her recliner for 15 to 20 minutes before resuming. She prepares supper three times a week, each of which requires an hour of preparation. She no longer goes boating or fishing, or plays ball. She can read in her recliner, and goes to her son's basketball games. She can lift 30 pounds, although she has found it difficult because it causes a sharp pain in her back. She can lift 15 pounds comfortably but not reliably. She takes medications only on an as-needed basis.

On a scale of one to ten, she has described her pain as an eight, when it has been aggravated by an activity such as doing the dishes. After a steroidal treatment, she testified that her pain diminished to a level of four or five for two or three weeks. After her visits to her chiropractor, her pain was a five for several days if she did little activity. None of her physicians has recommended surgery on her back or hands, nor have they prescribed any electronic pain blockers, TENS units, or back braces. (R. 285). Feldene reduced Schmidt's pain from an eight to a six, but she did not take it regularly.

A vocational expert, Cindy Younger, also testified at the hearing. Younger testified that a person with Schmidt's vocational characteristics and residual functional capacity (RFC) could lift 10 pounds frequently and 15 to 30 pounds occasionally and perform the job of bookkeeper, one of Schmidt's previous jobs. The ALJ asked Younger about the effect of a hypothetical RFC which would limit Schmidt to the frequent lifting of only nominal weights, occasional lifting of 10 to 15 pounds, with a limitation on standing no more than 2 to 4 hours per 8–hour shift, along with further limitations on manual activity. Younger testified that such an RFC would not preclude working as a bookkeeper. She stated that Schmidt had acquired the skills to work in such a job from her previous employment, and could work in the position of reception clerk, of which there were 2630 positions in Kansas and 900 in the Wichita area.

The ALJ determined that there was no evidence Schmidt met or exceeded a listed impairment, that she could not return to work due to her medical condition, but that she could perform other work in the national economy. The ALJ noted that Schmidt took Soma and Feldene, along with the nonprescription medications Advil, Bufferin, and Aleve. The ALJ also found that Schmidt had a pain-producing impairment and at least a loose connection with that pain. (R. 17).

However, the ALJ also determined that Schmidt's claim of a total inability to work was not credible. He noted several factors in reaching this conclusion: (1) that the objective medical records established "only minimal degenerative changes of the thoracic spine" (R. 17); (2) that there was a contradiction between the level of incapacitation claimed by Schmidt and her normal daily activities, and (3) the opinion of Dr. Cook and an analysis by the St. Joseph Medical Center which showed Schmidt was able to engage in a wider range of activities than those asserted by her. The ALJ found that the evidence established only that Schmidt suffered from a moderate level of pain, and this was not disabling.

In the present appeal, Schmidt argues that the ALJ's decision wrongly placed the burden of proof on her, improperly discounted the opinion of her treating physician Dr. Jones, and erred in finding her

assertions of disabling pain were not credible. The court finds, applying the relevant standard of review, that the ALJ's decision should be affirmed.

Under 42 U.S.C. § 405(g), "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401–02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989); *Kemp v. Bowen*, 816 F.2d 1469, 1475 (10th Cir.1987). Substantial evidence requires the presence of enough relevant evidence that a reasonable mind might consider the Secretary's decision adequately supported. *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420. The court must scrutinize the record and take into account whatever evidence fairly detracts from the evidence supporting the Secretary's findings. *Nieto v. Heckler*, 750 F.2d 59 (10th Cir.1984). An absence of substantial evidence will be found only where there is a conspicuous absence of credible choices and no contrary medical evidence. *Trimiar v. Sullivan*, 966 F.2d 1326, 1328 (10th Cir.1992). Evidence is insubstantial if it is overwhelmingly contradicted by other evidence. *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir.1994); *Ellison v. Sullivan*, 929 F.2d 534 (10th Cir.1990).

This deferential standard of review does not apply to the Secretary's application of the law. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir.1994); *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir.1984); *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir.1987). Thus, reversal may be appropriate when the Secretary either applies an incorrect legal standard or fails to demonstrate that she relied on the correct legal standards. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.1994).

In determining whether the decision of the Secretary is based on substantial evidence, the court is not to re-weigh the evidence or substitute its judgment for that of the Secretary. *Glass*, 43 F.3d at 1395. Thus, the court will typically defer to the ALJ on issues of witness credibility. *Hamilton v. Secretary of Health & Human Services*, 961 F.2d 1495, 1498 (10th Cir.1992). However, the court will not simply "rubber stamp" the decision of the Secretary. *Ehrhart v. Secretary of Health & Human Services*, 969 F.2d 534, 538 (7th Cir.1992). The court must determine if the decision is in fact grounded in the evidence or a mere conclusion, and will give particular weight to evidence of a compelling nature, such as the testimony of a treating physician. *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir.1988). Moreover, the court must review the evidence as a whole; substantial evidence will not be found based upon isolated facts in the record. *Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800–01 (10th Cir.1991); *Holloway v.. Heckler*, 607 F.Supp. 71, 72 (D.Kan.1985).

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than 65 years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir.1991). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A).

The burden is on the claimant to prove the existence of a disability that prevents him from engaging in his prior work for a continuous period of twelve months. *Trimiar*, 966 F.2d at 1329. If the claimant makes such a showing, the Secretary must show the claimant is able to do other work in jobs present in the national economy. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir.1989).

The Secretary employs a five step process in determining the existence of a disability, *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), a process which ends at any point if the Secretary determines the claimant is disabled or not. The steps, in order, require determinations of whether the claimant: (1) is currently engaged in substantial gainful activity; (2) has a medically severe impairment or combination of impairments; (3) has an impairment equivalent to one of a number of extremely severe impairments listed in 20 C.F.R. Part 404, Subpt. P, App. 1; (4) is unable due to the impairment to perform past work; and (5) has the residual functional capacity to perform other work available in the national economy, considering age, education, and past work experience. *See Kemp v. Bowen,* 816 F.2d 1469, 1474–75 (10th Cir.1987).

The ALJ's decision correctly states and applies the relevant standards for the determination of disability due to disabling pain. While Schmidt points to other objective indicia of physical impairments, it remains true that none of the impairments is more than minimal in nature. Further, as the ALJ noted there are repeated inconsistencies in the record between Schmidt's stated condition and other evidence of her RFC. For example, both the examinations by St. Joseph Medical Center and Dr. Cook show a markedly broader level of RFC than what is claimed by Schmidt. In her appeal, Schmidt repeatedly argues that a person need not be completely disabled to be entitled to benefits. This is certainly true but it misses the point here, which is that Schmidt's credibility as to her assertions of nearly complete disability—for instance, that she cannot perform sedentary work because she cannot hold a pen or pencil—are directly undermined by evidence that, for example, she performs needlework for as much as 45 minutes at a time. She also shops, cooks, keeps house, and attends her son's basketball games.

Schmidt argues that the ALJ erred in not explicitly considering facts which would buttress her credibility. Schmidt fails to show any error, however. The ALJ concluded that Schmidt's claims were partially credible, finding that she did suffer some moderate, non-disabling degree of pain. The allegedly corroborative evidence does not alter the inconsistencies noted in Schmidt's claims which were noted by the ALJ.

The ALJ also appears not to have erred in considering and partially rejecting Dr. Jones's post-hearing letter in which he stated that Schmidt's RFC was virtually nonexistent. As the ALJ noted, this opinion was in part based on a determination that Schmidt also suffered from carpal tunnel syndrome, even though he had previously attributed these ailments to neck problems; that the assertion of nearly complete disability was contradicted by the objective medical evidence of Schmidt's RFC produced by the examinations by Dr. Cook and the St. Joseph Medical Center; and that the opinions in his post-hearing letter were manifestly the product not of any objective evaluation of Schmidt's medical condition, but simply a repetition of Schmidt's own subjective statements.