**Patsy G. HINTON, Plaintiff,**

v.

**John J. CALLAHAN, Ph.D., Acting Commissioner of Social Security, Defendant.**

**No. 96–1167–JTM.**

United States District Court, D. Kansas.

April 16, 1999.

David H.M. Gray, Gragert, Hiebert & Gray, Wichita, KS, for plaintiff.

Emily B. Metzger, Office of U.S. Atty., Wichita, KS, for defendant.

*MEMORANDUM ORDER*

MARTEN, District Judge.

Plaintiff Patsy G. Hinton has applied for Social Security disability and supplemental security income benefits. In her application, she stated she became disabled on January 5, 1990 as the result of asthma. Her applications were denied initially and on reconsideration. On August 13, 1993, an administrative law judge (ALJ) found that Hinton was disabled and entitled to benefits from January 5, 1990 to February 28, 1993, but was not disabled thereafter. On February 15, 1994, the Appeals Counsel vacated the decision and remanded the case for further proceedings. On March 31, 1995, after a supplemental evidentiary hearing, the ALJ concluded that Hinton did not suffer from a disability under the terms of the Social Security Act. On March 13, 1996, the Appeals counsel denied Hinton's request for review. Hinton then filed the present action. For the reasons stated herein, the relief requested by plaintiff is denied.

*Facts*

Hinton was born February 7, 1957, and was 32 years old at the time she alleges she became disabled. She has 12 years of general educational development, and is considered to have a high school educational level. Her past relevant work experi-

ence has been that of a material cutter and a convenience store clerk.

Hinton has a history of asthma, and was hospitalized on November 9, 1987, where she was diagnosed as having an acute exacerbation of steroid dependent asthma. She was placed on 60 mg. Prednisone. (R. 156). About a week after her hospitalization, Hinton underwent pulmonary function studies, which concluded that she had a "MODERATE OBSTRUCTIVE LUNG DEFECT." (R. 166). Her forced expired volume at one second was 77% of predicted before broncho-dilation, and 21% of predicted following broncho-dilation. Maximum voluntary ventilation was 104% of predicted pre-broncho-dilation, and 102% afterwards.

The record does not reflect any medical treatment of Hinton during 1988. On December 3, 1989, Hinton went to HCA Wesley Medical Center, complaining of asthma and bronchitis, along with a cough, a runny nose, "generalized body aches," and a "knot in stomach." (R. 226). The hospital report shows that Hinton was found to have "minimal audible wheezing." (Id.) She was released after several hours with a direction to take her medication. (R. 225).

On January 18, 1990, Hinton was seen at Riverside Hospital, for potential alcohol abuse. Hinton told the attending physician, Dr. Carolina Soria, that she drank only intermittently, and had had half of a beer ten days before being admitted to the hospital. She denied suffering from any headaches or any other specific pain. (R. 213). She was found to be alert and oriented. Dr. Soria noted that "[t]here seems to be conflicting stories about the extent and nature of her alcohol and alcohol abuse and/or dependency." (R. 223). In reporting her examination, Soria notes under Respirations: "Lungs are clear to auscultation in all lung fields. There are no rales, rhonchi or rubs. Breath sounds are equal bilaterally." (R. 215).

Hinton told Soria she might have a drinking problem on and off but that it was not something she could not control. A report by Dr. Jane E. Kohrs ruled out DSM–III 305.0 Alcohol Abuse (R. 221), but notes that due to her pattern of alcohol use she could be considered a "PROBLEMATIC USER," (R. 217), and that Hinton "is probably at above average risk for the development of PSYCHOACTIVE SUBSTANCE ABUSE or DEPENDENCY in the future." (R. 218). Hinton was again seen in February, and her discharge summary reflects a diagnosis of alcohol dependency and a passive aggressive personality. (R. 212).

Hinton was seen at Wellington Hospital after an automobile accident on July 3, 1990. She had a bruise on the left eyebrow, a cut behind the left ear, and a bruise on the left arm and left ankle. X-rays of her head, left arm, and ankle showed no fractures. Hinton was prescribed Tylenol No. 3, an Ace wrap for her left ankle, and advised to elevate the ankle and apply ice. In the notes of her medical history, Hinton indicated that she had had asthma for 17 years and migraine headaches for 8 years. However, Hinton also denied having any lung problems. (R. 169). There is no indication in the notes that Hinton was currently suffering any headaches or other head problems.

On April 29, 1991, Hinton went to the emergency room of Harper Hospital in Harper, Kansas (Exhibit 26). Notes of the visit show that Hinton's problem "[s]tarted yesterday." (R. 173). She had a "few insp. & expir. wheezes." (Id.) Hinton was treated with Alupent, and said she was breathing better following her treatment.

Hinton returned to Harper Hospital six months later, on November 29, 1991. Notes of the visit state that Hinton reported "having trouble the last 2 or 3 days with asthma and began taking the Prednisone that she had on hand three days ago." (R. 174). She reported using her inhaler a number of times during the night, and she appeared tremulous, apparently from the use of the inhaler. She had some medium

pitched inspiratory and expiratory wheezes over both lung fields. She was given a treatment with one-half strength Alupent and auscultation was carried out. She had progressive clearing of the lungs and by the time of discharge she was clear to auscultation. Her final diagnosis included acute bronchial asthma and acute infectious rhinitis.

On February 16, 1992, Hinton returned to the Harper Hospital emergency room, complaining of shoulder and neck pain. An examination showed no physiologic numbness, even though the claimant stated there was a decrease in sensation of the leg and arm. She complained of a headache. Final diagnosis was somatic dysfunction of the right suboccipital and the neck. She was given a muscle relaxant.

On April 8, 1992, Hinton was seen in a local clinic. Notes of the visit indicate fine wheezes in the upper lungs. Diagnosis was acute asthmatic bronchitis, and Hinton was given a prescription for Seldane and Brethain, and Amoxicillin for infection.

Hinton has also been treated chiropractically. She began a course of treatment on June 17, 1992, after reporting having lifted sacks at home and straining herself. Her diagnosis includes cervical hypolordosis; retrolisthesis of cervical vertebrae; subluxation at level C–5 on C–6; subluxation at level T–7 on T–8; pelvic unleveling; degenerative joint disease of L–5 on S–1; and subluxation at level L–1 on L–2, and L–5 on S–1. The claimant began a series of chiropractic treatments which lasted approximately two and half months, with treatments one to two weeks apart. On June 26, Hinton reported to the chiropractor that she had a headache the previous day. On June 30, she reported another headache. On July 6, she reported that she had a sore neck and a headache, which she had been treating with aspirin. On July 9, Hinton stated that she "[g]ets fewer headaches now." Additional intermittent headaches are reported on July 13, August 25, and September 2, 1992.

On September 12, 1992, Hinton was evaluated for disability determination purposes by Dr. Daniel Thompson. Dr. Thompson noted that Hinton's chief complaints were asthma, her knees, and her wrists. A chest examination showed scattered wheezing with a mild reduction in breath sounds, and a two and a half inch difference in chest circumference between full inspiration and full expiration. Examination of the extremities showed some pain in both knees, but flexion and extension were full. Although Hinton complained of pain in both wrists, she was able to pick up a coin, button a button, and open the door. Pulmonary function study showed the claimant's forced expired volume at one second to be 1.6, and after broncho-dilation 1.9. Maximum voluntary ventilation was 40, and 48 after bronchodilation.

Dr. Thompson diagnosed arthralgias, but stated that although he found pain in both areas of the knees and wrists, there was a normal range of motion. He also concluded Hinton had a history of asthma, but commented that accessory muscles were not used for breathing. He stated: "Smoking cessation is absolutely imperative." (R. 184).

The claimant was treated by Dr. Larry Anderson of St. Luke's Hospital beginning on February 1, 1993. A chest x-ray showed an area of infiltration in the extreme right apex. The comment was that this was unusual for pneumonia but raised the possibility of tuberculosis. (R. 201). Hinton saw Dr. Anderson again on February 17. She showed some wheezing bilaterally but this was described as "pretty minimal." (R. 199). No rales or rhonchi were heard. Dr. Anderson prescribed Proventil repetabs, and Theodur, as well as Prednisone. Hinton reported that her attorney wanted to know about her knees, wrists, backache, and other problems.

Dr. Anderson felt that Hinton had "asthma syndrome," "complaint of multiple joint discomforts," and "anxiety/depression." (Id.) Anderson told Hinton that "I think it

is unlikely that she would be able to get any kind of disability related to asthma at her young age." (Id.).

Hinton saw Dr. Anderson on March 1, March 22, April 2, April 30, and June 24, 1993. She was seen again on March 1, and the claimant reported that Naprosyn was helping her arthritis and back symptoms. Examination showed diminished breath sounds bilaterally with some wheeze, but no rales or rhonchi. Again, the diagnosis was asthma syndrome. He continued her on her medications and prescribed Maximist machine to be used at home. Dr. Anderson's notes of the March 22 visit indicate that he thought Hinton had "significant lung disease." (R. 198).

On April 2, Dr. Anderson continued her medications as before. He commented that "today shows her to look better than she has in some time although she states she does not feel much better." (Id). There was a wheezing on forced expiration, but gentle breathing showed the lungs reasonably clear. Diagnoses continued to be obstructive airways disease/asthma, multiple joint discomfort, and anxiety/depression. Prednisone was to be tapered.

On April 7, a tuberculosis test was administered. This was reported back negative several days later.

Hinton also saw Dr. Anderson at the Sumner County Family Care Center. Blood laboratory studies showed a high SGOT and GGTP, as well as lactate dehydrogenase. The tests also showed a high level of ferritin and RDW. Theophylline and carbon dioxide levels were low. Dr. Anderson noted that the lactate dehydrogenase, GGTP, and AST studies were slightly elevated and were liver studies, and told Hinton that if she had had any alcoholic beverages in the last two to three days this could cause these enzyme elevations.

Dr. Anderson's clinical notes show that the claimant was seen on April 30, 1993 complaining of achiness and soreness in her wrists. The claimant admitted to drinking some whiskey on that morning and that she had an unopened can of beer in her truck. Dr. Anderson had performed a hernia operation on her husband that same morning. As a result, the claimant's heart rhythm was rapid. Anderson told Hinton he found nothing wrong with her joints other than her complaint of discomfort. He also found nothing unusual regarding bruising. His diagnosis was asthma, HCVD, and musculoskeletal discomfort. He increased her dosage of Clonadine and continued her on her asthmatic medications. A chest x-ray showed no demonstrable active or acute pulmonary pathology, and Dr. Anderson noted that her "[c]hest [was] more clear than usual with less wheeze." (R. 282).

On June 24, the claimant reported definitely doing better and that she had stopped smoking. She stated that she rarely took Prednisone, and rarely takes Aerobid or Proventil inhaler, but continued on Theolar and Proventil repetabs. She stated that her Naprosyn was infrequent. Dr. Anderson noted, with reference to Hinton's complaints of joint pain, that she was "appar'ly improving as she is taking less med." (R. 281). He also found that Hinton continued to suffer from asthma, but it was "markedly improved since cessation of smoking." (Id.)

On September 8, 1993, Hinton reported to Dr. Anderson with a complaint of having suffered a seizure. Hinton reported she had never had such a seizure before, and that there was no history of epilepsy in her family. An electroencephalogram showed a normal waking EEC for a person Hinton's age. A CT scan taken in the same month was also found to be normal. Hinton saw Anderson again on September 15, and reported no further such seizures.

On September 30, Hinton asked Dr. Anderson what she could do about headaches. Hinton told Anderson she'd been having headaches for about six months. Anderson told Hinton that the "EEG and CT scan recently done are reassuring to us

that she does not have one of the serious type headaches." (R. 279).

A repeat chest x-ray in December produced the same diagnostic impression as previously. On December 22, 1993, the claimant was hospitalized under Dr. Anderson's care complaining of shortness of breath and chest pain. Final diagnosis was pulmonary infection, possibly viral; and chronic asthma with exacerbation. Dr. Anderson noted that Hinton had stopped smoking in February, and stated:

> Although she certainly has long standing chronic obstructive airway disease I think she is in the long haul making improvement and I look forward to a point in the future when she won't require as much medication.

(R. 283).

A follow-up examination was conducted on January 6, 1994. Dr. Anderson reported:

> Today shows chest actually totally clear. I hear no wheeze or rhonchi. Air movement is a little less than I expect in a young lady such as this but she is markedly improved.

(R. 278).

The record is devoid of any further medical evaluations or treatments until August 12, 1994, when Hinton was evaluated and treated psychiatrically by personnel of the Sumner County Mental Health Center. Her principal therapist, Jeanne Brown, psychologist, stated that Hinton's social phobia has produced motor tension. She stated that the claimant reported not shopping by herself and having sleep disturbance. She has apprehensive expectation, and fears being judged or evaluated. She is afraid that people are watching her, and has a persistent irrational fear of a specific situation, namely the fear of social situations in which she may be judged or evaluated. Ms. Brown stated that the claimant does not have full blown panic attacks but does have severe exacerbations of anxiety disorder symptoms. She stated that the claimant drinks to relax herself in a mis-

guided attempt to medicate herself for anxiety. Ms. Brown was of the opinion that the claimant cannot be employed, and that she met the requirement of listing 12.06 for anxiety-related disorders.

In a separate statement, Ms. Brown reported that the claimant had an intake evaluation on August 12, 1994, and individual therapy on August 22, 1994. On August 31, 1994, she did not show for her therapy appointment, but on September 28, 1994, she saw Dr. Romalis for medication. On October 3, 1994, she engaged in individual therapy. She did not show for either the October 17 or October 26, 1994 appointments, and did not report to the mental health center thereafter. Brown wrote on February 15, 1995 that she had had no contact with Hinton since October 3 of the previous year and that she "assumed that Ms. Hinton is no longer interested in or motivated to continue therapy." (R. 315).

Hinton testified that her breathing is better and her attacks occur less often than they were in January and March of 1993. However, she has shortness of breath walking to the mailbox. She uses a Pulmonaide machine two to three times each day. Humidity and stress make things worse. When she does her housework, she can do one room and then stop. Vacuuming is hard for her. She stated she could do it for 15 to 30 minutes and then must sit and rest for 15 to 30 minutes. She stated that three to four days per week she has bad tension headaches. Stretching exercises do not seem to help her headache. She had a seizure in September of 1993, and the doctor thought her blood pressure was the cause. When asked if she thought possible heavy drinking of alcohol was the reason for her seizure, she stated she had slowed down her drinking when she started having seizures. Now she has only a few beers. She also has depression and feels empty and sad.

On a typical day she will get up at 4:00 a.m. and fix breakfast for her husband. Then she will watch the news. After that

she will straighten the kitchen for 30 minutes and take a bath and rest. Sometimes she will go to town on Tuesday or Wednesday. When she goes to the store, there are too many people and they make her nervous.

She stated she goes to school functions only when she can't get out of it. On Tuesday she does the laundry and goes to the bank. On Thursday she goes to counseling. She has only gone fishing twice this year. She would do this more often if she felt safe driving. Nevertheless, she takes her husband to work. In the fall she will go to the Bluegrass Festival in Winfield which lasts 10 days. They stay in a camper and she simply sits with the family. Four years ago she traveled to Ohio, her husband's former home state.

The Administrative Law Judge also received the testimony of a vocational expert at the hearing. Asked about a hypothetical individual who could lift only 10 pounds occasionally, but nominal weights frequently, could sit for between 5 and 6 hours, and stand for up to 2 hours, but could not work around fumes, the expert testified that this would preclude any past work as performed by the claimant. For unskilled labor, the expert testified that there were jobs as a cashier or as a final optical assembler, which such an individual could perform. When asked about tolerance for stress, or limitations on concentration, the expert testified that more judgment is involved in more complex jobs, but that repetitive and routine jobs would be available to such an individual.

Dr. Krishna Rama Das, a psychiatrist, also testified before the ALJ. Dr. Rama Das testified that, although there were references to passive aggressive personality in Hinton's records, this was not shown to be a disorder, but simply a description of her personality. He testified that there would need to be further evidence, which was not shown in the records, for there to be a basis for finding that Hinton had a diagnosable emotional condition. (R. 350). Asked whether Hinton's condition met the requirements for a listed impairment or that her condition has deteriorated, Dr. Rama Das stated "If I were to go by what I have in front of me I don't see very much." (R. 351). While Hinton had been described as having a depressive personality component, according to Dr. Rama Das

it doesn't look as serious enough [and she] has not been ... admitted or treated just for depression as such. Although mention of depression has been made in the progress notes and in the personality, they just say it's a personality, all of us have a personality, we all have different type of personalities, but when it becomes a personality disorder, that is when it interferes in the occupational and social functioning, that becomes a problem.

(R. 352). He testified that the functional effects of the alleged mental impairment were not marked or extreme in Hinton's case. (Id.) Dr. Rama Das testified that it would be beneficial for Hinton to work in a low-stress occupation.

In the present case the Administrative Law Judge found that Hinton's alleged impairments did not meet or exceed any listed impairment. He did find that Hinton had one or more impairments which prevent her from performing her past relevant work. Reviewing the evidence, the ALJ concluded that Hinton had "a long standing problem with asthma," but that subsequent examinations showed that she was "markedly improved." (R. 21, 22). He further noted that the asthma was under control with medication, Dr. Anderson's comment in response to an inquiry by Hinton that he felt it was unlikely that Hinton would likely receive any disability benefits, and found that Hinton's asthma treatments were sufficiently infrequent that they did not interfere with her ability to work. (R. 22–23).

As to the migraine headaches, the ALJ noted a contradiction between Hinton's profession of having experienced the headaches for many years, and the fact that she

never asked Anderson for treatment for such headaches until she mentioned them on September 30, 1993. The ALJ also noted that Dr. Anderson specifically found that EEC and CT exams showed nothing, and concluded the headaches were not serious. The ALJ also referenced the normal results reported by Dr. Anderson from these exams in connection with Hinton's claim of seizure-related disability. Dr. Anderson's notes indicate that the seizure of September 8, 1993 was not repeated. Finally, as to the claim of disability based on an impaired right knee, the ALJ noted that the record was devoid of any treatment for the knee, other than a brief series of chiropractic visits, after which she made no further complaint. (R. 22).

The ALJ also considered the contention that Hinton was subjected to disabling pain. After correctly reciting the standards for reviewing such claims, the ALJ wrote:

First, the Administrative Law Judge again refers to the claimant's report in June of 1992 of having lifted sacks at home and strained some muscles. Secondly, the claimant has good respiratory excursion, which is not normally seen in persons with advanced obstructive airway disease. Next, the claimant's own treating physician doubted her ability to get disability by his comment in February of 1993. In addition to her testimony of limitation, the claimant also testified at the hearing that she prepares breakfast for her husband, and straightens up the kitchen after watching the morning news. She goes to town on Tuesday and does laundry and goes to the bank, and sometimes goes to town on Wednesday. She has a driver's license and went fishing twice during the past year. Every year she goes to the Blue Grass Festival, according to statements made in the record, and she testified to having gone to the same festival this past fall. Four years ago, she went to Ohio with her husband, and also testified to doing significant camping, al-

though she does not do as much as formerly. The Administrative Law Judge finds that these activities are inconsistent with significant pain, or limitation, or discomfort which the claimant alleges. The claimant takes several medications, and did not testify to any side effects from such medication.

(R. 26).

The ALJ concluded that Hinton was able to perform sedentary work, and accordingly determined that she was not disabled. (R. 26).

*Conclusions of Law*

Under 42 U.S.C. § 405(g), "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401–02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989); *Kemp v. Bowen,* 816 F.2d 1469, 1475 (10th Cir.1987). Substantial evidence requires the presence of enough relevant evidence that a reasonable mind might consider the Secretary's decision adequately supported. *Richardson,* 402 U.S. at 401, 91 S.Ct. 1420. The court must scrutinize the record and take into account whatever evidence fairly detracts from the evidence supporting the Secretary's findings. *Nieto v. Heckler,* 750 F.2d 59 (10th Cir.1984). An absence of substantial evidence will be found only where there is a conspicuous absence of credible choices and no contrary medical evidence. *Trimiar v. Sullivan,* 966 F.2d 1326, 1328 (10th Cir.1992). Evidence is insubstantial if it is overwhelmingly contradicted by other evidence. *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir.1994); *Ellison v. Sullivan,* 929 F.2d 534 (10th Cir.1990).

This deferential standard of review does not apply to the Secretary's application of the law. *Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir.1994); *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir.1984);

*Frey v. Bowen,* 816 F.2d 508, 512 (10th Cir.1987). Thus, reversal may be appropriate when the Secretary either applies an incorrect legal standard or fails to demonstrate that she relied on the correct legal standards. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994).

In determining whether the decision of the Secretary is based on substantial evidence, the court is not to reweigh the evidence or substitute its judgment for that of the Secretary. *Glass,* 43 F.3d at 1395. Thus, the court will typically defer to the ALJ on issues of witness credibility. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1498 (10th Cir.1992). However, the court will not simply "rubber stamp" the decision of the Secretary. *Ehrhart v. Secretary of Health & Human Services,* 969 F.2d 534, 538 (7th Cir.1992). The court must determine if the decision is in fact grounded in the evidence or a mere conclusion, and will give particular weight to evidence of a compelling nature, such as the testimony of a treating physician. *Gossett v. Bowen,* 862 F.2d 802, 805 (10th Cir.1988). Moreover, the court must review the evidence as a whole; substantial evidence will not be found based upon isolated facts in the record. *Casias v. Secretary of Health & Human Services,* 933 F.2d 799, 800–01 (10th Cir.1991); *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan.1985).

■ The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than 65 years of age, and is under a "disability." *Flint v. Sullivan,* 951 F.2d 264, 267 (10th Cir.1991). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in

the national economy...." 42 U.S.C. § 423(d)(2)(A).

■ The burden is on the claimant to prove the existence of a disability that prevents him from engaging in his prior work for a continuous period of twelve months. *Trimiar,* 966 F.2d at 1329. If the claimant makes such a showing, the Secretary must show the claimant is able to do other work in jobs present in the national economy. *Sorenson v. Bowen,* 888 F.2d 706, 710 (10th Cir.1989).

The Secretary employs a five-step process in determining the existence of a disability, *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), a process which ends at any point if the Secretary determines the claimant is disabled or not. The steps, in order, require determinations of whether the claimant: (1) is currently engaged in substantial gainful activity; (2) has a medically severe impairment or combination of impairments; (3) has an impairment equivalent to one of a number of extremely severe impairments listed in 20 C.F.R. Part 404, Subpt. P, App. 1; (4) is unable due to the impairment to perform his past work; and (5) has the residual functional capacity to perform other work available in the national economy, considering her age, education, and past work experience. *See Kemp v. Bowen,* 816 F.2d 1469, 1474–75 (10th Cir.1987).

■ The Court finds that the plaintiff has failed to show she is entitled to benefits and that the decision of the ALJ must be affirmed. The claimant first argues that the ALJ improperly evaluated her contention that she suffers from disabling asthma. Specifically, Hinton argues that the ALJ erred in discussing the results of medical tests showing a lack of disability in 1987 (which showed that Hinton had a 102% lung capacity), and otherwise selecting only portions of the medical record. According to Hinton, it is unfair to reference that 102% finding, since it was based on a test conducted after she had been hospitalized.[1]

In fact, it appears to be the claimant who singles out certain portions of the record, in particular the March 22, 1993 comment by Dr. Anderson that Hinton had "significant lung disease," while ignoring the total history of Hinton's condition. The full narrative of that history, summarized above, shows that while Hinton clearly had an asthmatic condition, it was not disabling. Claimant's argument ignores notes from April 30, 1993 which indicate that Hinton suffered from less wheezing. It ignores the fact that on June 24, 1993 Dr. Anderson observed that Hinton was definitely doing better once she stopped smoking. And she ignores the observation by Dr. Anderson on January 6, 1994 that her lungs by that time were "actually totally clear" and that she was "markedly improved." (R. 278).

■ The plaintiff next complains that the ALJ referenced Dr. Anderson's comment that he did not believe it was likely that Hinton would receive disability benefits based on her asthma. Hinton argues it was error to rely on the comment because it might be Dr. Anderson was simply talking about the parsimoniousness of the Secretary. This is wrong at two levels. First, this unfounded speculation about the reason for Dr. Anderson's comment is contradicted by the evidence. As indicated earlier, Dr. Anderson stated he thought it unlikely Hinton "would be able to get any kind of disability related to asthma *at her young age*". (R. 199) (emphasis added). The comment by Dr. Anderson is directly tied to Hinton's physical condition, not any perceived unfairness on the part of the Secretary in approving benefits. Age is a legitimate factor in considering whether a person is disabled. *Fisher v. Bowen*, 869 F.2d 1055, 1058 (7th Cir.1989). Second, the ALJ did not "rely" on the comment for the conclusion reached. At this portion of the opinion, the ALJ wrote:

The evidence, as set forth above, shows that while the claimant does have significant asthma, such asthma was controlled by medication, and the care and treatment of Dr. Anderson. The Administrative Law Judge reiterates Dr. Anderson's comment in his clinical note of February 17, 1993, that he thought it was unlikely the claimant would be able to get any kind of disability.

(R. 22). The quoted language indicates that the key ingredient in the ALJ's decision is the wholly uncontestable fact that her asthma was controlled with medication. The ALJ then simply referenced the comment by Dr. Anderson as a further illustration of the nondisabled condition of the claimant.

The plaintiff argues that the ALJ erred in discounting her contention that she suffered from disabling headaches, on the grounds that they were stress-related. This distorts the ALJ's findings. Although the ALJ noted—as it is clearly stated in the medical records—that the headaches were stress-related, it is apparent that this was not the sole basis for the determination that the headaches were not disabling. The ALJ specifically found that Hinton's claims were not credible on the point, in that, although she claimed to have suffered from the headaches for many years, she never asked Dr. Anderson for treatment for such headaches until September 30, 1993. The ALJ further noted that Dr. Anderson specifically found that EEC and CT exams showed nothing. The conclusion that the headaches were "not serious," is not some capricious finding by the ALJ based on his view the headaches were stress-related; it is the conclusion of Dr. Anderson as explicitly stated in his notes in the medical records. (R. 279).

The plaintiff argues that the ALJ erred in evaluating her subjective claims of disabling pain. It appears that the ALJ cor-

---

**1.** The test results were conducted after a hospitalization, but the relevant point is that it demonstrates that, with medical treatment, Hinton's asthma was not disabling. There is no evidence in the record that her lung capacity later deteriorated.

rectly cited the appropriate legal standards for the consideration of such claims. (R. 24–25). He then concluded that the claims were not credible in the light of the evidence. The plaintiff complains that the ALJ should have considered all the factors which might have supported a determination of credibility. However, a review of the ALJ's decision indicates that he referenced the entire background of the case, and simply concluded that Hinton's claims of disabling pain were inconsistent with her life activities and the lack of continued medical treatment or medication for the alleged pain. Reviewing all the medical history and other evidence, the court must conclude that the ALJ did not err in concluding that the alleged impairments, either individually or in combination, constitute a disability.

Finally, plaintiff argues that the ALJ erred in rejecting the finding by Jeanne Brown, M.A., that she suffered from a mental impairment equivalent to Listing 12.06. In the present case, the ALJ specifically determined that Hinton did not meet any listed impairment. Brown's report fails to mention any of the specific findings (increased heart rate or perspiration, apprehensive expectation, fear of being judged, or vigilance and scanning) that are necessarily elements of Listing 12.06 Part A. The ALJ specifically found that Hinton's life routines were sufficiently active and free from social limitations.

In short, it appears that the ALJ fairly evaluated the evidence which, on the one hand, contains the conclusory statement by a psychologist that Hinton had a listed impairment. On the other hand, as the ALJ noted, the medical records and Hinton's own testimony showed a level of activity inconsistent with that claim of disability. In addition, the court noted the testimony of psychiatrist and medical doctor Rama Das, who did not indicate that Hinton suffered from such a disabling medical impairment. In respect to the claim of mental disability, the ALJ wrote:

The record also reveals that the claimant was evaluated and treated psychologically beginning in August of 1994. Outside of the intake evaluation, the claimant was seen only twice in individual therapy, and apparently discontinued whatever medication was prescribed for her by Dr. Romalis. The claimant was diagnosed as having a generalized social phobia, and depressive symptoms with anxiety. The Administrative Law Judge must call into question the severity of these diagnoses which will be discussed subsequentially in the discussion of the testimony of the medical expert, and in the assessment of the claimant's credibility.

.     .     .     . ·     .

Although [Hinton] has maintained that she does not like to be out among other people, and on this basis she was diagnosed by one mental health worker as having a social phobia, nevertheless, the claimant also testified at the hearing that she would go to town sometimes on Tuesday or Wednesday and go to a store. She stated she also went to school functions, even though she tried to get out of them. On Tuesday, she goes and does laundry and goes to the bank, activities requiring coming in contact with others. Each year in the fall, she attends a Blue Grass Festival which lasts for periods of up to 10 days. The Administrative Law Judge finds that these activities do not show an inability to come in contact with, or interact with others. As to the claimant's alcohol consumption, the Administrative Law Judge notes that her admission concerning this shows her consumption was confined to weekends. Assuming this pattern to continue, this would, nevertheless, leave the work week during which time the claimant does not drink and would not interfere with any work activity. The Administrative Law Judge also notes that even though the claimant has been prescribed anti-depressant and anti-anxiety medication on two different occa-

sions, the claimant neither continued those medications nor continued psychotherapy. Furthermore, the Administrative Law Judge also notes that the claimant did not seek mental health treatment until after the supplemental hearing and the testimony of Dr. Rama Das. The Administrative Law Judge, therefore, finds that the claimant does not have a mental impairment, or a combination of mental impairments, which would significantly reduce her capacity to perform sedentary work.

(R. 23–24). The ALJ further wrote:

The Administrative Law Judge also received the testimony of a medical expert at the supplemental hearing. The expert, Dr. Rama Das, is a medical doctor and psychiatrist. Based on the evidence of the record, Dr. Rama Das stated that her symptoms were more consistent with a passive-aggressive personality. Nevertheless, he also stated that everyone has a personality and that does not show a disorder. He also found her to be depressed, and to have some problems with anxiety. He stated that the evidence also pointed to alcohol dependence. Nevertheless, he also noted that Dr. Anderson indicated that this was less of a problem than previously. Dr. Rama Das was of the opinion that the claimant would be limited to low-stress occupations.

(R. 23).

▮ Hinton argues that the ALJ improperly discounted Brown's opinion, since she was a psychologist rather than a medical doctor. The rule requiring that substantial weight be given to a treating medical practioner, unless good cause is shown to the contrary, is not limited to medical doctors, *Leggitt v. Sullivan,* 812 F.Supp. 1109, 1118 (D.Colo.1992), and has been applied in the case of a treating psychologist in *Harmon v. Shalala,* No. 93–1114–MLB (D.Kan. Aug. 22, 1994).

However, the problem for the plaintiff here is two-fold. First, the ALJ did not reject Brown's conclusions because she was a psychologist. He rejected it because he found "good cause" for rejecting it in the medical history of Hinton, her life activities, and the opinions of Dr. Rama Das. Even if Brown was a "treating psychologist," there were good reasons for discounting her opinion. *See Wood v. Chater,* 57 F.3d 1081, 1995 WL 352482 (10th Cir.1995) (ALJ gave "specific and legitimate reasons for disregarding" opinion of clinical psychologist).

▮ Second, the court finds that under the circumstances of the case Ms. Brown cannot be considered a *treating* psychologist. Ms. Brown was plainly contacted by Hinton only after the initiation of her disability claim *and* Hinton attended only two of the five scheduled therapy sessions. Brown herself was prompted to write that, in light of the missed visits it seemed "Ms. Hinton is no longer interested in or motivated to continue therapy." (R. 315). A treating physician is one " 'who [has] treated a patient over a period of time or who [is] consulted for purposes of treatment.' " *Frey v. Bowen,* 816 F.2d 508, 513 (10th Cir.1987) (quoting *Broadbent v. Harris,* 698 F.2d 407, 412 (10th Cir.1983)). In contrast, the opinion of a physician whose "treatment" of the claimant has been "limited and of short duration" has been held to be of lesser value and not entitled to the stronger weight of the treating physician rule. *Salazar v. Secretary of HHS,* 961 F.2d 220, 1992 WL 78079 at *1 (10th Cir.1992). The greater weight given the testimony of treating physicians serves to recognize both the greater opportunity for the treating physician to become aware of the circumstances of her patient's medical condition due to her frequent contact and extended relationship with the patient, and the greater inherent credibility possessed by a medical authority who has been consulted for purposes of treatment as opposed to an individual consulted solely for the purposes of delivering an opinion to be used in supporting a claim for benefits. These considerations are wholly missing in the present

case, and do not support the application of the treating physician rule to Ms. Brown's correspondence.

Whether individually or in combination, Hinton has failed to show that her alleged impairments are disabling or that the ALJ erred in the rulings above.

IT IS ACCORDINGLY ORDERED this 16th day of April, 1999, that the plaintiff's appeal is hereby denied.